## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NEELU PAL,<br>        *Plaintiff*,<br><br>        v.<br><br>MARK CANEPARI, et al.,<br>        *Defendants*. | No. 3:20cv13 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

This case arises from the Plaintiff's May 2018 encounter with police officers and EMTs after a 911 call was made from her home and police were dispatched to investigate a possible domestic assault.  Neelu Pal, who is self-represented, brings this action under 42 U.S.C. § 1983 against Wilton police officers Mark Canepari, Arnault Baker, Brandon Harris, and Anna Tornello; Chief of Police John Lynch; the Town of Wilton; EMTs Joseph Bryson, Drew Kennedy, and Harry Downs; Wilton Volunteer Ambulance; Norwalk Hospital; and Nuvance Health, Inc.  ECF No. 199. She claims that in retaliation for her having filed an earlier lawsuit against other Wilton police officers and EMTs, the Defendants violated her constitutional rights by illegally entering her home, using excessive force, unlawfully imprisoning her, and forcibly transporting her to the hospital. She also alleges a host of state law claims.  The complaint asserts the following claims: deprivation of civil rights under 42 U.S.C. § 1983 (count 1); First Amendment retaliation (count 2); excessive force (count 3); unlawful search and seizure (count 4); malicious prosecution and abuse of process (count 5); municipal liability (count 6); conspiracy to violate civil rights (count 7); assault and battery (count 8); negligent infliction of emotional distress (count 9); intentional infliction of

emotional distress (count 10); defamation (counts 11-13); and negligence (count 14).[1]  *Id.*  Wilton police officers Canepari, Baker, Harris, and Tornello, Chief of Police Lynch and the Town of Wilton (collectively "the "Wilton Police Defendants") move for summary judgment as to all counts.  ECF No. 276.  For the reasons discussed below, the motion is GRANTED IN PART and DENIED IN PART.  I address in a separate ruling issued today the motions for summary judgment filed by the remaining defendants.  ECF Nos. 281, 282.

## I.     FACTS

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits, and are drawn primarily from the contemporaneous audio and video recordings of the events the parties submitted as exhibits.[2]  The facts are undisputed unless otherwise indicated.

*Prior Incident*

The incident underlying this lawsuit was not the Plaintiff's first interaction with the Wilton Police Department.  In 2015, Wilton police officers were dispatched to her home after she called 911.  In 2018, the Plaintiff filed a lawsuit in this Court against various Wilton Police Officers and EMTs as well as Chief of Police John Lynch and the Town of Wilton concerning that encounter.  *Pal v. Cipolla*, No. 3:18cv616.  Specifically, she alleged that the defendants unlawfully entered her home, used excessive force, unlawfully imprisoned her and transported her to the hospital for a psychiatric exam, and sexually assaulted her in the ambulance.  *Id.* at ECF No. 49.  The defendants were served with the complaint on May 4, 2018.  *Id.* at ECF No. 34; ECF No. 325-1,

---

[1] The operative complaint, which spans 76 pages, does not differentiate among the Defendants.  Rather, the title of each count is addressed to all Defendants, except for the *Monell* claim in count 6, and each count incorporates all preceding factual allegations.

[2] The Defendants have submitted the video footage and audio recording from the body worn cameras ("BWC") of the defendant officers who were on the scene. See ECF No. 293 (manual filings); Defs' Exhibits D (Canepari BWC), F (Baker BWC), G (Harris BWC), and H (Tornello BWC).  The Plaintiff does not dispute the authenticity of the footage and indeed submitted the videos with her opposition.  See ECF No. 344 (manual filings) Pl's Exhibits 23 (Canepari BWC), 25 (Harris BWC), 27 (Baker BWC), and 29 (Tornello BWC).  In addition to the BWC videos, the Plaintiff has submitted videos from stationary cameras in her home.  Pl's Exhibits 2-12. These videos do not have audio.

Pal Aff. ¶ 2.  Although the Plaintiff named Chief Lynch and the Town of Wilton as defendants in this action, as she did in her earlier case, the police officers and EMTs in this case were not named as defendants in the Plaintiff's earlier case.

*911 Call*

On Saturday night May 5, 2018, a 911 call was made from the Plaintiff's home in Wilton, Connecticut.  ECF No. 277-2, Defs' Ex. B, audio recording.  On the call, a female voice can be heard saying "Come on, hit me you asshole."[3]  *Id.*  A different female voice can be heard in the background but the dialogue is unclear.  *Id.*  Then the call disconnected.  *Id.*

The police dispatcher who received the call stated that it "sound[s] like a domestic" and called the number back.  *Id.*  Meanwhile, officers were dispatched to the Plaintiff's house.  *Id.* When the dispatcher called the number back, he said it was the "Wilton Police department" and asked if everything was all right.  ECF No. 277-3, Defs' Ex. C, audio recording.[4]  *Id.*  A man (later identified as the Plaintiff's husband, Sunil Yadav) responded "yes, it's fine" and that "I think we kinda of just misdialed."  *Id.*  The dispatcher questioned "misdialed? You sure about that?" and asked again if everything was "okay."  *Id.*  Yadav said "yeah everything is fine." *Id.* The dispatcher stated that "it didn't sound too good when I was on the phone before."  *Id.*  Yadav responded that "we were trying to call India" and that "it just happened by mistake."  *Id.*  The officer stated, "Ok, so I heard somebody call somebody an asshole . . . ."  *Id.*  Yadav audibly exhaled and reiterated that the call was a misdial.  *Id.*  The dispatcher said "Ok, so why was there screaming in the

---

[3] The Plaintiff disputes that anyone said these words.  ECF No. 320-1 at 1, Pl's Local Rule 56(a)2 ¶ 2 ("No caller stated the above words.");  ECF No. 325-2 at 71, Pal. Dep. (denying hearing those words on the recording).  The audio recording of the call, however, is clear and "speak[s] for itself." *Scott v. Harris*, 550 U.S. 372, 379-80 & n. 5 (2007) (holding that a court ruling on a motion for summary judgment must "allow the videotape to speak for itself" and that the court should not adopt a "version of the facts" that is "blatantly contradicted" by the videotape; "Respondent's version of events is so utterly discredited by the [video] that no reasonable jury could have believed him.")

[4] The Plaintiff submitted a transcript of this call but it is not certified and appears to be self-prepared.  ECF No. 326-3 (referring to speaker as "Sunil").  It is therefore hearsay and may not be considered in this ruling.  See Fed. R. Civ. P. 56(c)(2),(4).  I instead utilize the audio.

background?" *Id.*  There was a pause and the dispatcher asked "everything ok?" to which Yadav replied that "yeah everything is fine." *Id.*  The dispatcher observed "you're breathing pretty heavy and you sound kinda of nervous" and asked "what's going on?" *Id.*  Yadav responded that it was "kinda like a fight with the wife." *Id.*  The dispatcher asked if it was physical and Yadav stated "no, nothing physical." *Id.*  The dispatcher asked Yadav if he was "sure" because it sounded like she said "you hit me" and asked him to "tell me what's going on." *Id.*  Yadav paused and said "her mom is also here." *Id.*  The dispatcher asked "what happened?" *Id.*  There is another pause, then Yadav says "uh" and that it was a "misdial sort of thing." *Id.*  He further stated "we are fine" and "we will work it out." *Id.*  The dispatcher stated that "that is not an option" and that police were on their way to the house. *Id.*

Canepari drove to the Plaintiff's home with his cruiser's emergency lights and siren activated.  Defs' Ex. D, Canepari BWC.  The first officer on the scene, he exited his cruiser at 8:01 pm.  Canepari BWC at 20:01:51.  Canepari walked to the back of the house, opened and entered through a gate, and followed a walkway to the back deck, which was attached to the house. Canepari BWC 20:01:55-02:22.  He did not have backup and paused at the stairs to the deck; a female voice - from inside the house - loudly said "Shut up." Canepari BWC at 20:02:25; Pl's Ex.3, home surveillance 20:02:20-03:10 (Canepari paused at steps.).  Canepari remained in place until the Plaintiff's mother walked out and saw him. Canepari BWC 20:03:11.  Canepari then walked onto the deck.  Canepari BWC 20:03:14.  The Plaintiff and her husband came out of the house onto the deck. Canepari BWC 20:03:15.  Canepari said "Hi Sir, how are you?" Canepari BWC 20:03:15.  Without preamble, the Plaintiff said "excuse me, get out."  Canepari BWC 20:03:17.  Canepari asked if there is anyone else in the house, to which Yadav responded there was no one in the house, and that the two children were in the backyard.  Canepari BWC 20:03:26.

Canepari asked "What's happening here? What's the problem?" Canepari BWC 20:03:29.   The

Plaintiff responded by demanding his name, which he provided.   Canepari BWC 20:03:30.   She

then asked for a "card," and Canepari told her she could have one but "not yet."   Canepari BWC

20:03:34-03:36.   Canepari, speaking to both the Plaintiff and Yadav, said he needed "to find out

what's happening" and asked "Who called?"   Canepari BWC 20:03:38-03:39.   The Plaintiff

responded that "nothing's happening.   I called.   By mistake."   Canepari BWC 20:03:41-03:43.

Canepari said, "You called 911 by mistake?" to which the Plaintiff responded "Yes" followed by

"I would like you to leave." Canepari BWC 20:03:45-03:48.   Canepari stated that he couldn't leave

"just yet." Canepari BWC 20:03:50.   The Plaintiff talked over him and said "there is a lawsuit."

Canepari BWC 20:03:55.   Canepari responded that if she could explain to him "what's happening,"

he could leave.   Canepari BWC 20:03:58.   Without explanation, the Plaintiff suddenly turned away

from Canepari and walked into the house.   Canepari BWC 20:04:00.   Canepari and Yadav followed

her inside.   The Plaintiff picked up her pocketbook, told him to "Get out of the house," then walked

toward Canepari, who was standing by the door to the deck, and put her pocketbook down on the

counter by the door.   Canepari BWC 20:04:04-04:18.

*Harris and Baker Arrive*

        Harris and Baker[5] arrived and proceeded to the back deck.   Defs' Ex. G, Harris BWC

20:04:08.   Harris – seeing Canepari in the house - entered through the open door;   Baker remained

on the deck. Harris BWC 20:04:19.   The Plaintiff told Harris that she wanted him "to get out of

the house." Harris BWC 20:04:20.   Harris responded "no, we're not getting out of the house right

now."   *Id.*   Canepari and Yadav suggested that they all "go out" and Canepari asked the Plaintiff

if she needed her bag, but she didn't answer and left it on the counter.   Harris BWC 20:04:22-

---

[5] Baker, a sergeant, was the supervisor on the scene, ECF No. 277-12 at 38, Harris Dep., and was present at the front of the house when Harris arrived.   Defs' Ex. G, Harris BWC 20:03:45 - 20:04:01.

04:33. As the Plaintiff walked out of the house onto the deck, she repeated to the officers "Out of the house." Harris BWC 20:04:25-04:26. Yadav, who was already outside on the deck, said, "Neelu, come on, cool down." Harris BWC 20:04:25-04:27. Out on the deck, the Plaintiff, facing Baker, pointed her finger at him and demanded his name. Harris BWC 20:04:32. She pushed Yadav away and again asked Baker his name. Harris BWC 20:04:28. When Yadav asked her again to "calm down," the Plaintiff snapped at him to "shut it" and pushed him away a second time. Harris BWC 20:04:30-04:32; Pl's Ex. 2, home surveillance 20:04:28-04:33 (shows Plaintiff shoving Yadav away from her twice). Baker exclaimed "stop it or you're going to be arrested." Harris BWC 20:04:35. The Plaintiff replied, "Hey, I've been arrested." Harris BWC 20:04:39. She then turned to Harris, who was on her right, and pointing her index finger at him, asked "What is your name?" Harris BWC 20:04:40.[6] In an attempt to separate the parties, Baker took Yadav by the arm and they walked further along the deck some feet away. *Id.* Harris twice asked the Plaintiff "what is going on tonight?" Harris BWC 20:04:49. The Plaintiff responded that "nothing" was going on. Harris stated "something is going on because we got called here" to which the Plaintiff replied "Not by me." Harris BWC 20:04:52-04:54. The Plaintiff walked away from Harris, who protested "You're not going over there," as she strode toward the deck stairs and Yadav, who was standing near Baker. Harris BWC 20:04:58. As she approached Yadav, he extended his arm as if to stop her. Harris BWC 20:04:57-5:02. The Plaintiff appeared to be poised to walk past Baker, who was standing near Yadav in front of the deck stairs leading to the walkway to the driveway. Harris BWC 20:05:04. She raised her arms and told the officers to "get out." Harris BWC 20:05:04-05:06. Harris put his hands on her left arm and told her to "calm down or you're going to go in handcuffs." Harris BWC 20:05:06-05:07. The Plaintiff raised her right arm

---

[6] The Plaintiff avers in her affidavit that Harris was chomping and chewing and that he spit in her house. ECF No. 325-1 ¶ 34. She addressed him as "Chomper." Harris BWC 20:04:43.

and responded "I'll go in handcuffs." Harris BWC 20:05:10. She appeared to put her arms behind her back and Harris proceeded to handcuff her. Harris BWC 20:05:14. When Yadav moved toward her, Canepari told him that the officers needed to keep the Plaintiff and him separated. Harris said, "You want to go in handcuffs too?" Harris BWC 20:05:15. Yadav protested that handcuffing the Plaintiff was "not right." Canepari assured Yadav that she was not under arrest, and Harris explained that she "is just being detained until she cools down." BWC Harris 20:05:22. Harris said, "We'll do the same to you," but Yadav was not handcuffed. As he put the handcuffs on the Plaintiff, Harris said, "just relax." Harris BWC 20:05:26.

After being handcuffed, the Plaintiff grew louder and more upset and in a raised voice said "Get out." Harris BWC 20:05:29. The Plaintiff's mother touched her, which caused Harris to instruct her that she could stay but that she couldn't touch the Plaintiff. Harris BWC 20:05:38. The Plaintiff loudly proclaimed, "Mama, these people already sexually assaulted me." Harris BWC 20:05:44. The Plaintiff's mother apparently put a hand on Harris's left arm, and he said, "Ma'am, do not push me or I'll put you in handcuffs." Harris BWC 20:05:47. The Plaintiff said, "Mama, don't touch him." Harris BWC 20:05:54.

Video footage shows that the officers separated the individuals: Canepari was with Yadav and Baker escorted the Plaintiff's mother away from the Plaintiff, whom she continued to try to touch. Harris BWC 20:05:53-05:56; Pl's ex. 2 20:05:59. Harris told the Plaintiff that "all [she] has to do is relax" and she can "come out of the handcuffs." Harris BWC 20:05:56-6:00. The Plaintiff answered loudly, "Hey brother I am relaxed" and appeared to pull away from him, shouting "Let's go brothers." Harris BWC 20:06:00-06:06. Yadav, who had been standing some distance away with Canepari, then walked toward her. The Plaintiff said "Are you hurting me? You are hurting me." Harris BWC 20:06:06-06:10. She added, in a loud voice, "Let me tell you,

there are cameras everywhere!" Harris BWC 20:06:15.  When Harris asked her if she realized that she is "doing this in front of your children," the Plaintiff responded "Yeah I do fucking realize that."  Harris BWC 20:06:22. Yadav repeatedly asked her to "please calm down" but the Plaintiff told him to "get away" and loudly asserted "I want to be arrested by these assholes."  Harris BWC 20:06:24-06:26.  The Plaintiff loudly repeated  "These assholes have already assaulted me." Harris BWC 20:06:32-33.  The Plaintiff's mother urged her to "keep quiet, just keep quiet." Harris BWC 20:06:35.  Harris advised the Plaintiff's mother that she could stay near the Plaintiff as long as she doesn't "put [her] hands on [him] again."  Harris BWC 20:06:37.  The Plaintiff said, "Get away you asshole, let's go."  Harris BWC 20:06:44-45. Harris responded "no, right now, you're not going anywhere, you're just calming down."  Harris BWC 20:06:54.  The Plaintiff yelled "Hey bunch of assholes," "you know these people already sexually assaulted me," and "There's a lawsuit pending." Harris BWC 20:06:53-07:02.  The Plaintiff turned to Harris and said "What's your fucking name asshole?" and he answered "Well, it's not what you're calling me. I can guarantee you that.  That's not my name." Harris BWC 20:07:05-12.  In response to the Plaintiff's mother's pleas for the Plaintiff to be quiet, the Plaintiff told her to "get away from me."  Harris BWC 20:07:18.  Harris started to say "If you give me a second, I . . ." but the Plaintiff cut him off and shouted "I don't give a fuck." Harris BWC 20:07:21.  Harris stated that he wanted to "make sure the handcuffs aren't too tight" and the Plaintiff yelled that they were "too tight" and that "you're hurting my hand." Harris BWC 20:07:25.  Harris responded that "I'm hurting your hand because you keep trying to pull away from me.  It's called pain compliance." Harris BWC 20:07:26.  The Plaintiff protested that the handcuffs were too tight and said again, "Let's go brothers."  Harris BWC 20:07:49.

*Yadav's Statements*

While Harris was standing with the Plaintiff, Canepari and Baker were speaking with Yadav in the house. Yadav confirmed that the Plaintiff had been drinking. Canepari BWC 20:06:39. He said that she's "sorta upset, that's why she dialed it." Canepari BWC 20:06:47-06:50. While the officers were speaking to Yadav in the house, the Plaintiff was yelling profanities from outside. Canepari BWC 20:07:00-07:26. Canepari asked Baker if he could put the Plaintiff in the cruiser. Baker agreed. Canepari BWC 20:07:40.

*Plaintiff is Placed in the Cruiser*

Canepari exited the house, approached Harris and the Plaintiff on the deck, and told Harris that the Plaintiff should be placed in the cruiser. Harris BWC 20:07:46. Harris asked Canepari to hold her so he "can check that the handcuffs aren't too tight because she keeps moving." Harris BWC 20:07:48.[7] At this point, the Plaintiff screamed repeatedly "You're hurting me." Harris BWC 20:07:57-08:00. Canepari asked Harris if he needed smaller cuffs.[8] Harris BWC 20:08:01. Harris testified that he double-locked the handcuffs to prevent them from tightening, ECF No. 277-12 at 53, 79, Harris Dep., but the Plaintiff disputes this, ECF No. 325-1 ¶ 46, and it is not corroborated by the body worn camera footage. Harris said "all she has to do is cool off." Harris BWC 20:08:12. The Plaintiff loudly protested to her husband, "This is what they are doing, because they are trying to get away from this fucking lawsuit." Harris BWC 20:08:11-08:15.

Canepari and Harris escorted the Plaintiff down the deck stairs to the cruiser. Canepari BWC 20:08:21-08:27.[9] While walking to the car, she directed Canepari's attention to her bare

---

[7] The Plaintiff disputes this and testified in her deposition that the Defendants actually tightened the handcuffs. ECF No. 277-10 at 82, Pal. Dep.

[8] The Plaintiff claims that Harris and Canepari "discussed making the handcuffs smaller." ECF No. 320 at 22, 33; ECF No. 325-1, Pal Aff. ¶ 58. According to the audio recording, Canepari asked Harris if he needed smaller cuffs. Harris BWC 20:08:01.

[9] Although the Plaintiff avers in her affidavit that they "dragged" her "down the [deck] stairs," ECF No. 325-1, Pal. Aff. ¶ 65, the video evidence "speak[s] for itself," *Marcavage v. City New York*, 689 F.3d 98, 110 (2d Cir. 2012), and

feet, stating in a conversational tone, "Do you see my feet? Without shoes?"  When he responded

that he saw them, she commented "Yeah, I'm sure you do, you white motherfucking assholes."

Canepari BWC 20:08:28-08:36.  She then told the officers to "go fuck yourself assholes." Harris

BWC 20:08:38.  When they arrived at the cruiser in the driveway (on the video neighboring homes

come into view), the Plaintiff abruptly started to scream, "Oh, you're hurting my arms" and

"You're hurting me, you're hurting me, help me please." Canepari BWC 20:08:40-08:49.  The

Plaintiff shrieked almost continuously.  Canepari BWC 20:08:51-08:58.  Canepari told her to sit

in the car, Harris put his hand on her head, and he and Canepari ushered her into the vehicle.

Canepari BWC 20:09:08.  Canepari then leaned in and over her to fasten the seatbelt.  While he

did so, the Plaintiff continued to shriek at a deafening volume.  Canepari BWC 20:09:07-09:32.

According to the Plaintiff, while Canepari was leaning over her and fastening the seatbelt, he

whispered, "we know about your lawsuit, bitch, this is what happens when you sue us."  ECF No.

325-1, Pal Aff. ¶ 66.  But Canepari's camera and audio do not reflect anything remotely like this.

In fact, his mouth does not approach either of her ears, which would have been essential to

communicate a "whisper" amid her shrieking. Harris went to turn on the camera in the cruiser and

Canepari told him "to shut the door and just leave her there." Canepari BWC 20:09:41.  Harris and

Canepari walked back to the deck where Baker was speaking to Yadav and the Plaintiff's mother.

Canepari BWC 20:09:57.

When Canepari reached them, the Plaintiff's mother was crying and he said, "Let me

explain something really quick, just to put you at ease a little bit. She is putting on a show because

she is very upset" and assured her that "we're not hurting her."  Canepari BWC 20:10:00-07.

Canepari told Yadav and the Plaintiff's mother that the Plaintiff would stay in the car until "we

---

does not remotely support this allegation.  Canepari BWC 20:08:21-08:27; Pl's Ex. 2, home surveillance 20:08:19-
08:24.

finish speaking with you." Canepari BWC 20:10:10. The officers continued their investigation into why the 911 call was made. Baker told Harris and Canepari that he was "still trying to determine" from Yadav what happened and "we don't know yet." Canepari BWC 20:10:18. Harris asked Yadav "who called?" Harris BWC 20:10:30. Yadav responded "It was my wife." Harris BWC 20:10:36.[10] Harris asked "Why did she call?" and said "obviously she is under the influence of alcohol, I can smell it on her." Harris BWC 20:10:42. Harris commented that she did not appear to be in the "right state of mind" and seemed "overexcited." Harris BWC 20:10:47. Yadav responded that "she has been trying to call" India.[11] Harris, exasperated, replied that "this is nonsense." Harris BWC 20:10:52-11:02. Harris said, "If you're lying to me, that's a charge." Harris BWC 20:11:19-20. Harris insisted Yadav "tell me the truth, what happened?" Harris BWC 20:11:20. Yadav explained that "she had some drinks," Harris BWC 20:11:24, and that "she was upset" and had been trying to call India. Harris BWC 20:11:28-31. Yadav said "she's a little bit upset with her mom and with me so that's why the screaming." Harris BWC 20:11:49-11:51. Baker interjected that he listened to the 911 call and heard her say "you hit me" and asked Yadav who hit her. Harris BWC 20:12:04-12:07. Yadav responded that nobody hit her. Harris BWC 20:12:09. When Baker asked him then why she would say that, Yadav answered "she probably had some drinks." Harris BWC 20:12:16. Yadav stated that his children had been outside the entire time. Harris BWC 20:12:30. Yadav said, "I would request that, like, she just like had some

---

[10] The Plaintiff and her husband both told the officers that the Plaintiff had made the 911 call. But they subsequently changed their story. The Plaintiff testified in her deposition that she did not make the call. ECF No. 277-10 at 68, Pal Dep. She states in her opposition that when she told Canepari that she was the one who called, she did so "rhetorically." ECF No. 320 at 8. Yadav testified in his deposition that his mother-in-law made the call. ECF No. 326-1 at 33, Yadav Dep. He further testified that he has never spoken to his mother-in-law about whether she was the one who dialed 911. ECF No. 326-1 at 36. The complaint alleges that the Plaintiff's mother made the call. ECF No. 199 ¶ 40. Although the Plaintiff emphasizes in her papers that she was not the one who made the call, I need not resolve who made the call in order to rule on the Defendants' motions.

[11] In support of her assertion that her mother was responsible for the call, the Plaintiff asserts that Yadav is pointing to the Plaintiff's mother when he says this. ECF No. 320-1 ¶ 9.

drinks, she will calm down."  Harris BWC 20:12:34-38.  The officers pressed Yadav for a reason why the Plaintiff was upset and Yadav explained that the Plaintiff's mother wanted to return to India.  Harris BWC 20:13:10.  He reiterated that no one hit anybody and "she's just saying it." Harris BWC 20:13:47-13:53.  Harris said even assuming it was a misdial, why would she say "you hit me?" Harris BWC 20:14:31-14:42.  Harris said to Yadav, "She wouldn't be saying that if she thought she was calling someone in India, correct?" Harris BWC 20:14:45.  Harris clearly was unsatisfied with Yadav's explanation, and said "If you don't want to tell me the truth, that's fine, I'm not going to beat it out of you." Harris BWC 20:15:20-15:24.[12]

Meanwhile, the Plaintiff continued to scream from within the cruiser and can be heard on the officers' camera microphones while they are on the deck.  Harris BWC 20:12:40-13:22.  Harris radioed in to advise the Wilton Police Department that "you're probably gonna get some noise complaints."  Harris BWC 20:13:19-13:30.  Baker asked Yadav "how long does it take for her to calm down after drinking?"  Harris BWC 20:15:42.  Baker explained that they need to hear from Yadav about the 911 call and that they tried to hear from her, but "she isn't telling us much, she is just screaming."  Harris BWC 20:15:58-16:01.  Baker asked Yadav "why does she say she wants to be arrested?" Harris BWC 20:16:30.  Harris told Yadav that the officers needed to know what happened, and he wanted to "make sure we leave here so that your children are safe, so that she's not going to do any harm to herself or anyone else." Harris BWC 20:17:04-17:11. Yadav asked him to "just leave us." Harris BWC 20:17:22.  Harris and Yadav debated who was at fault for upsetting the Plaintiff, with Yadav saying it was the officers' fault.  Harris BWC 20:17:30-17:51.

Harris suggested to the Plaintiff's mother that she see if she could calm the Plaintiff down. Harris BWC 20:18:32-35.  As Harris, Baker and the Plaintiff's mother walked toward the cruiser,

---

[12] The Plaintiff asserts that Harris said he would "beat it out of you."  ECF No. 320 at 9.  That is not supported by the audio recording in which Harris can clearly be heard saying "I'm not going to beat it out of you."

the Plaintiff can be heard screaming.  Harris BWC 20:19:17; 20:19:28-19:38.  Harris commented to Baker that "I don't get it."  Harris BWC 20:19:39.  The Plaintiff screamed at her mother to "get away" and continued to shriek. Harris BWC 20:19:47.  Baker - faced with the Plaintiff's agitated behavior - told Harris that it has "got to be an EMS call, she's intoxicated."  Harris BWC 20:19:53-56.  Baker advised the Plaintiff's mother to tell the Plaintiff to stop screaming. Harris BWC 20:20:13.  Despite her mother's entreaties, the Plaintiff continued to scream, shouted at her to "shut up, get away," and repeatedly kicked the partition of the cruiser.  Harris BWC 20:20:20-21:05. Baker explained to the Plaintiff's mother that he was going to call an ambulance to take her to the hospital. Harris BWC 20:21:17.  The Plaintiff continued to scream and yelled for her mother to "get away," "shut up," and that they "assaulted me." Harris BWC 20:21:38-21:57.

In a further effort to calm her down, Canepari and Baker brought Yadav to the cruiser. Canepari BWC 20:22:03.  Baker told Yadav that if the Plaintiff did not calm down, he was going to send her to the hospital. Canepari BWC 20:22:05.  The Plaintiff was distraught and continued to scream.  Harris told Yadav and her mother that he would not let the Plaintiff out of the car until she calmed down.  Harris BWC 20:22:33.  As Yadav tried to speak to her, the Plaintiff screamed. Harris BWC 20:22:42.  Harris told the Plaintiff's mother that it was "not safe" and that "she hasn't calmed down one bit," and that they were calling an ambulance.  Harris BWC 20:22:54.  Yadav continued to plead with the Plaintiff, telling her that if she calmed down the officers would let her out of the car.  The Plaintiff responded "I don't give a shit. Let me out. I don't wanna be let out. Go fuck yourself assholes." Harris BWC 20:23:57-23:59.  She continued to scream.  She yelled at Yadav to "get away from me." Harris BWC 20:24:31.

The officers summoned an ambulance.  While they waited for it to arrive, the Plaintiff remained visibly distraught, continued to scream, told her mother and husband to "shut up" and to

"get away from me," and hurled profanities at the officers.[13]  Canepari BWC 20:26:02-32:37.  She told Yadav, in a calmer voice, to call the lawyer who had filed the earlier lawsuit.  Canepari BWC 20:26:28-30.  She repeatedly said that her "arms hurt."  Canepari BWC 20:27:36.  Canepari explained to Yadav that the Plaintiff was "causing herself pain" because she was handcuffed behind her back and was sliding down the seat and pushing against the partition.  Canepari BWC 20:24:10. Baker commented that the Plaintiff might need sedation and contacted police dispatch for a medic.  Baker BWC 20:28:56, 20:29:17. Video footage shows the Plaintiff kicking inside the cruiser.  Baker BWC 20:31:23.  Baker commented, "She's out of control."  Baker BWC 20:35:21.

*Ambulance*

When the ambulance arrived, manned by EMTs Kennedy and Bryson, Canepari told Bryson that they received a 911 call that sounded like a "physical domestic" and "this woman is intoxicated and flipping out.  So we're committing her."  Canepari BWC 20:36:15.  Harris opened the cruiser door but the Plaintiff refused to get out and told the officers to get a warrant.  Canepari BWC 20:37:46.  She continued to protest, screaming "fuck you assholes," that she was sexually assaulted, and that she "will never calm down."  Canepari BWC 20:38:08-40.  She initially refused to exit the cruiser and the officers ordered her to get out of the car.[14]  Canepari BWC 20:40:08-27.  She then did so but refused to get on the stretcher.  Canepari, Harris, and the EMTs lifted and secured her to the stretcher.  Canepari BWC 20:40:13-28.  She remained in handcuffs, and continued to scream and yell, her speech laden with profanities.  After the stretcher was loaded into the ambulance, Canepari and Bryson removed her handcuffs and placed her hands in restraints, so that each arm was restrained to the side of the stretcher.  Canepari BWC 20:42:25-

---

[13] Yadav, when asked at his deposition whether he recalled the Plaintiff using foul language that night, testified that he did not recall.  ECF No. 326-1 at 62, Yadav Dep.
[14] The Plaintiff was in the cruiser for about 35 minutes.  Canepari BWC 20:8:37 (placed in cruiser); 20:40:11 (exited cruiser).

43:01.  The Plaintiff repeatedly demanded a "woman officer."  Canepari BWC 20:43:14-25. She stated that "the last time these people responded to my house, they sexually assaulted me." Canepari BWC 20:43:34.  As Bryson, Kennedy and Canepari strapped the Plaintiff into the stretcher, she told them to get their "fucking" hands off her.  Canepari BWC 20:44:03.  Kennedy deferred taking her vitals, stating that he would wait to check her vital signs until she calmed down. Canepari BWC 20:44:30.  The Plaintiff continued to insist on the presence of a female officer and refused to be transported anywhere without one present.  Canepari BWC 20:44:39.  In her affidavit, the Plaintiff avers that she "saw Mark Canepari mouthing the words 'we have to cover' to Defendants Drew Kennedy and Joseph Bryson prior to exiting the ambulance."  ECF No. 325-1, Pal Aff. ¶ 90.  She also averred that after she stated that she had been sexually assaulted in the 2015 incident, Kennedy "was laughing, smirking and responded by stating to me words to the effect 'We know. That is why we are here.'"  ECF No. 325-1, Pal Aff. ¶ 96.

Baker told Canepari that the Plaintiff was incapacitated and to fill out the form(s) to transport her to the hospital.  Canepari BWC 20:48:29-57.  Canepari completed a State of Connecticut Department of Mental Health and Addiction Services Police Emergency Examination Request under Conn. Gen. Stat. § 17a-503(a) indicating that the Plaintiff was "agitated," "combative" and "unable to focus."[15]   ECF No. 279-5.  Under the heading "Risk of Dangerousness," Canepari wrote that the Plaintiff "repeatedly told officer she would 'Fucking kill you'" and that she "pushed officers and kick[ed] cage of police cruiser."  *Id.*  He checked off the

---

[15] Connecticut law provides that "[a]ny police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502." Conn. Gen. Stat. § 17a-503(a).

"substance abuse" box and wrote "alcohol."  He wrote that officers were "unable to communicate at all with patient. Very hostile and completely uncooperative."  *Id.*

*Downs*

When EMT Downs arrived on the scene, Baker told him that the Plaintiff was "drunk and can't calm down."  Baker BWC 20:44:28.  The Plaintiff refused to let Kennedy take her blood pressure and told him not to touch her.  Baker BWC 20:45:05-45:09.  She stated that she is a physician and reiterated that she did not want to be touched. Baker BWC 20:45:30.  She stated that she was sexually assaulted in an ambulance by "your fucking compadres." Baker BWC 20:45:41.

Baker contacted the police department to see if a female officer was available, explaining that the Plaintiff "is making some allegations and I just want to make sure we're covered."  Baker BWC 20:46:28-38.  The Plaintiff permitted Downs to take her blood pressure, Baker BWC 20:49:06, and called the EMTs a "bunch of assholes."  Baker BWC 20:49:13.  The Plaintiff refused to let Downs take her pulse.  Baker BWC 20:49:58.  Downs informed her that unless she calmed down and cooperated, he was going to give her some Versed, a sedative.  Baker BWC 20:50:07. The Plaintiff protested that that would be assault. Baker BWC 20:50:27.[16]  The Plaintiff said "You're forcing me [to submit to a pulse check], and sir, I'll take you for everything you have." Baker BWC 20:50:29-31.  No sedative was administered.

---

[16] The Plaintiff alleges that she was sexually assaulted.  ECF No. 277-10 at 108, Pal. Dep.  In her affidavit, the Plaintiff avers that Kennedy and Bryson "groped her breasts."  ECF No. 325-1, Pal Aff. ¶ 104.  In her deposition, she testified that Tornello "aided, abetted, assisted the people who had sexually assaulted me and unlawfully imprisoned me, hence, she sexually assaulted me by aiding and abetting them."  ECF No. 277-10 at 108-09, Pal. Dep.  *See also* ECF No. 277-10 at 112, Pal Dep. (testifying that "maybe" Tornello touched Plaintiff's breasts).  She further alleged that Canepari sexually assaulted her and that Baker "aided, assisted and abetted" others in their assault of her.  ECF No. 277-10 at 112-13. Finally, she alleged that Harris sexually assaulted her but testified that "I cannot specify" how he did so.  ECF No. 277-10 at 114, Pal Dep.  The Plaintiff's encounter with the officers was completely captured by video.  Her claims of sexual assault as to them do "not survive the witness of your eyes."  *Brown v. City of New York*, 798 F.3d 94, 104 (2d Cir. 2015) (Jacobs, J., dissenting)(citing *Scott*, 550 U.S. at 378 n.5).

*Tornello*

Tornello, a female police officer, arrived.  While Tornello was standing outside the ambulance and Baker was standing at the entrance, he told her that it "came in" as a domestic dispute and that the Plaintiff was intoxicated.  Tornello asked "what's the allegations?"  Baker responded "there's no allegations.  Nobody is saying anything.  They are all an Indian family.  The mother is visiting from India" and that an argument ensued and the Plaintiff dialed 911.  Tornello BWC 20:53:52-54:08.  As Tornello entered the ambulance, Downs, Bryson, and Kennedy were standing over the Plaintiff's left arm attempting to check her blood glucose level.  The Plaintiff said, "I refuse any medication, any treatment.  These people are forcing me for no reason.  There is no medical emergency.  I am a physician."  Tornello BWC 20:54:13-25.  The Plaintiff shouted, "Bring me to the hospital.  There is no emergency.  Bring me there."  Tornello BWC 20:54:28-33. Kennedy explained that because the Plaintiff had had some alcohol, they needed to test her "sugar." Tornello BWC 20:54:47-49.  The Plaintiff denied being intoxicated and said "when we get to the hospital, we figure it out."[17]  Tornello BWC 20:54:53-55.  Tornello stepped out of the ambulance for a few moments to speak to Harris about moving Tornello's car.  Tornello BWC 20:57:12-45. After she returned, Downs exited the ambulance.  Tornello BWC 20:58:27.

Kennedy said to Bryson, "I'm not giving mileage if you have a police officer in the back." Tornello BWC 21:00:22-32.[18]

Baker told Tornello that the Plaintiff was not under arrest.  Tornello BWC 20:59:05.  He said "we can't find anything to arrest for other than being 'a verbal.'"  Tornello BWC 20:59:08.

---

[17] The Plaintiff denies being intoxicated. ECF No. 325-1, Pal Aff. ¶ 161.  She testified, however, that Canepari "smell[ed] of alcohol" and "was acting drunk and stoned."  ECF No. 277-10 at 86, 99, Pal. Dep.

[18] The Plaintiff ascribes a sinister meaning to this comment.  She states that this statement refers to "sexually assaulting" her.  ECF No. 320-1 ¶ 58; ECF No. 325-1 ¶ 112, Pal. Dep.  She points to nothing in the record to support this interpretation.

At this point, in the ambulance, the Plaintiff was calm.  The Plaintiff told Tornello that "you have done nothing wrong" and that "you have not done anything to me."  Tornello BWC 21:05:04. When Tornello asked her how she was feeling, the Plaintiff responded calmly that her hands hurt because she was in handcuffs too long.  Tornello BWC 21:05:10-05:19. The Plaintiff told Tornello about her allegations concerning the 2015 incident to which Tornello responded that she was "shocked to hear that" because she knew Cipolla (one of the officers named in the lawsuit) and commented that he "seemed like such a nice person."  Tornello BWC 21:07:45.  At one point, Tornello's cell phone rang and the Plaintiff asked her who called.  Tornello responded that it was a friend and the Plaintiff said, "Cipolla?"  Tornello BWC 21:09:12-09:25.[19]

Tornello asked the Plaintiff what happened before she arrived.  The Plaintiff responded, "I don't know.  They showed up at my house.  They said someone called 911.  I don't know.  Maybe my kids were playing with the phone.  I don't know."  Tornello BWC 21:09:52-10:04.  The Plaintiff denied arguing with anyone and maintained that she was making dinner. She said "suddenly they showed up because the case is pending." Tornello BWC 21:10:08-10:24. Tornello accompanied the Plaintiff in the ambulance to the hospital.  In a conversational tone, the Plaintiff asked Tornello if she could loosen the restraints, which she did.  Tornello BWC 21:11:25-14:58.

When the ambulance arrived at Norwalk Hospital, Kennedy, who drove the ambulance, opened the ambulance doors.  The Plaintiff called him a "Motherfucker" to which he responded "I don't know why you say that to me, Neelu.  I didn't do anything to you."  She responded, "Yeah you're right, you didn't, I should call you boy scout of the year."  Tornello BWC 21:19:02-19:20. She said, "How many women have you assaulted, you son of a bitch?" Tornello BWC 21:20:30.

---

[19] The Plaintiff told Tornello that she would "have to subpoena" Tornello's phone.  Tornello BWC 21:09:14-09:20.

In the ER, the Plaintiff told the EMTs not to touch her and to get away from her.  Tornello BWC 21:23:09-23:31.  She insisted Tornello stay and threatened to call the WPD when Tornello indicated she could not stay.  Tornello BWC 21:26:06-26:14.  Tornello stated she needed to ask her supervisor and stepped out to make a call.  Tornello BWC 21:27:03-27:45.  While in the hallway, she spoke to an ER nurse who asked if the Plaintiff had really filed a lawsuit.  Tornello stated "actually I was talking to some of my co-workers . . .  and actually they are the ones." Tornello BWC 20:21:32-34.  After telephoning Baker, Tornello informed the Plaintiff that she had to leave to respond to other calls and departed.  Tornello BWC 20:30:45-55.  The Plaintiff declined treatment and was discharged.  Norwalk Hospital ER records indicate a diagnosis of agitation and noted "erythematous marking on right wrist, likely from restraints." ECF No. 279-12 at 7.  The Plaintiff alleges she suffered emotional distress, post-traumatic stress disorder ("PTSD"), and significant hand injuries as a result of the incident.  ECF No. 325-1, Pal Aff. ¶ 170.

*Medical Records*

Downs completed a medical report that stated that "Wilton PD responded to a domestic dispute, arrived to find intoxicated female. Pt verbally abusive to police and pushed them.  Pt arrested for assault, ambulance called. Pt refusing any physical contact or evaluation, medic dispatched. Now, pt very abusive to EMS, using foul language and threatening to sue us.  Odor of ETOH on breath. Pt [states] she was transported, possibly last year or the year before and was sexually assaulted in the ambulance. Pt insists on a female PD officer."  ECF No. 279-11 at 2.

Bryson completed a report that stated in pertinent part:

[Wilton PD] explained [that] Patient was agitated and combative.  Patient's husband and mother were speaking with officers near the police car, and tried to calm patient when officers opened door. [EMTs] observed patient in back of car when PD opened door.  Patient, with hands cuffed behind back, was yelling and kicking at police.  The patient was verbally abusive and threatening to sue police and [the EMTs].  Patient's skin was dry.  Patient smelled of alcohol.

ECF No. 329-2.

The Plaintiff alleges that Wilton Ambulance, Norwalk Hospital, and its parent Nuvance Health Inc. submitted invoices to her medical insurance provider "for the unnecessary and forcible provision of services to Plaintiff."  ECF No. 199 ¶¶ 187-188.

## II.    PROCEDURAL HISTORY

This case has a long and tortuous procedural history.  The Plaintiff filed this lawsuit in January 2020. ECF No. 1.  In November 2020, I dismissed Count 1, titled "Deprivation of Federal Civil Rights under 42 U.S.C. § 1983," because it "is vague and redundant in that it does not appear to plead legal claims that are distinct from those already pled."  ECF No. 65.  In May 2021, I granted the Plaintiff's motion to consolidate this action with a later filed action, *Pal v. Bryson*, 3:20cv630, against a subset of the defendants.  ECF No. 170.  My ruling set forth the procedural history of the case, familiarity with which is assumed.  Also in May 2021, I dismissed under Fed. R. Civ. P. 37(b)(2)(A)(v) the Plaintiff's claim that Baker made a false report to the Connecticut Department of Children and Families ("CT-DCF") claiming that the Plaintiff had neglected her children on the grounds that she failed to provide discovery relevant to that claim.  ECF No. 173. In March 2022, I granted the Plaintiff's motion for leave to file an amended complaint, which is the operative Sixth Amended Complaint.  ECF No. 247.  In doing so, I noted that the Plaintiff's proposed complaint suffered from certain deficiencies, such as including count 1 which I previously had dismissed, but stated that I would address this at a later date.  ECF No. 247 at 3 n.1 On April 14, 2022, the Defendants filed this motion.  The Plaintiff, having been granted several extensions of time in which to respond, filed her opposition July 5, 2022.[20]  ECF No. 320.  The

---

[20] In her opposition, the Plaintiff claims that the Defendants failed to produce requested discovery including recordings of voicemails she left for John Lynch and video evidence from the police vehicles.  ECF No. 320 at 33; ECF No. 320-1 ¶¶ 27-28, Additional Material Facts.  The Defendants deny that they failed to produce requested discovery.  ECF

Defendants filed their reply brief on August 4, 2022.  ECF No. 353.

## III.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiff[ ] as the non-moving part[y], when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (rejecting plaintiffs' "characteriz[ation of] their behavior toward the [arresting] officers as cordial" because "audio recording show[ed] indisputably that they were neither courteous nor compliant") (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (rejecting non-movant's account of police chase because it was "so utterly discredited by the [video recording] that no reasonable jury could have believed him")).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most

---

No. 351 at 4.  Federal Rule of Civil Procedure 56(d) "permits the district court to defer summary judgment or permit additional discovery when the nonmovant files an affidavit or declaration stating that 'for specified reasons, it cannot present facts essential to justify its opposition.'" *Sura v. Zimmer, Inc*., 768 Fed. App'x 58, 59 (2d Cir. 2019) (quoting Fed. R. Civ. P. 56(d)). The Rule 56(d) affidavit or declaration must show "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *UBS AG, London Branch v. Greka Integrated, Inc*., 2022 WL 2297904, at *3 (2d Cir. June 27, 2022). The Plaintiff has not availed herself of Rule 56(d) nor does she argue that she is unable to oppose the motion due to the alleged missing discovery.  In any event, the discovery period in this case concluded long before the Plaintiff filed her opposition papers.

favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson,* 477 U.S. at 252 (emphasis added).  "At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)).  Finally, where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted).  Nonetheless, "unsupported allegations do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## IV.    DISCUSSION[21]

---

[21] As a preliminary matter, the Defendants argue that the Plaintiff's claims against Tornello and Lynch lack merit because they were not involved in the alleged events.  ECF No. 276-1 at 40.  It is undisputed that they were not present at the Plaintiff's residence at the time the alleged unlawful entry, excessive force, and false imprisonment occurred.  Tornello merely accompanied the Plaintiff in the ambulance and Lynch was never on the scene at all.  Although the complaint alleges, "[u]pon information and belief," that Chief Lynch, who was a named defendant in the Plaintiff's prior lawsuit as well, communicated with Baker about the Plaintiff "prior to [his] dispatch and/or arrival at plaintiff's home on 5-5-18," ECF No. 199 ¶ 251, the Plaintiff does not press this allegation in response to the Defendants' motion and has not offered any evidence in support of it.  The Plaintiff may not hold Lynch liable merely because he was the officers' supervisor.  "[T]here is no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  The Plaintiff does not address the Defendants' personal involvement argument and has failed to offer contrary evidence.  Accordingly, summary judgment is GRANTED as to all claims against Tornello and Lynch.

**Count 1: Section 1983**

As noted, I previously dismissed this claim.  ECF No. 65, 170.  In addressing the Plaintiff's proposed Fourth Amended Complaint, ECF No. 53, I dismissed count 1, an omnibus § 1983 claim containing a litany of claims, on the grounds that it was vague and duplicative of claims already pled elsewhere.[22]  ECF No. 65, 170.  Count 1 was and is dismissed.

**Count 2:  First Amendment Retaliation**

The Plaintiff alleges that Baker, Harris and Canepari[23] "acted to violate [her] rights as secured by the Constitution in retaliation for plaintiff's filing of complaints against Defendants, and their fellow-police officers and EMTs."  ECF No. 199 ¶ 328.  The Plaintiff appears to argue that the Defendants' conduct on May 5, all of which she maintains was unconstitutional, was motivated because she filed a lawsuit concerning the events of April 2015.

To establish a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Rodriguez v. Gusman*,  2023 WL 219203, at *2 (2d Cir. Jan. 18, 2023) (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)).  If a plaintiff establishes these elements, a defendant may still avoid liability by establishing that he "would have taken the adverse action even in the absence of

---

[22] I note that Count 1 briefly refers to an allegation that the Defendants discriminated against the Plaintiff based on her national origin, which is not otherwise pleaded in the complaint.  ECF No. 199 ¶ 319.  As to this, the complaint alleges only that in response to Tornello's question about what the allegations were, Baker responded "No allegations…. They are all an Indian family."  ECF No. 199 ¶ 141.  That is the extent of the allegations as to race or national origin.  ECF No. 320 at 19.  (The Plaintiff notes that the officers are white albeit usually as a precursor to hurling obscenities at them.)  A Plaintiff claiming selective enforcement must show "both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  The complaint does not allege that she was similarly situated to other individuals who received different treatment nor does it state a plausible claim of discriminatory intent.  And the Court is aware of no evidence to suggest that she was singled out because of her national origin (or any other protected characteristic, for that matter).  To the extent that any discrimination claim remains, I grant summary judgment in favor of the Defendants.
[23] See footnote 21.

the protected conduct." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (internal quotation marks and citation omitted).

The Defendants first argue that the Plaintiff has not satisfied the second element.[24]  They posit that they are entitled to summary judgment because "there is no indication that any conduct of the Wilton defendants actually chilled plaintiff's First Amendment Rights as she filed the instant lawsuit and continued pursuing her prior lawsuit following this incident."  ECF No. 276-1 at 15. According to the Defendants, "this is fatal" to her retaliation claim.  ECF No. 276-1 at 16.

To be sure, "[a] plaintiff can establish an injury by showing that the defendants' actions 'effectively chilled the exercise of his First Amendment right.'" *Clark v. Boughton*, 2022 WL 4778582, at *8 (D. Conn. Oct. 3, 2022) (quoting *Curley v. Vill. Of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).  But "[c]hilled speech is not the *sine qua non* of a First Amendment claim." *Dorsett v. Cnty. of Nassau,* 732 F.3d 157, 160 (2d Cir. 2013).  Rather, a plaintiff "has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Id.* (emphasis in original).  The Plaintiff - in alleging *inter alia* that the Defendants unlawfully entered her home, handcuffed her, and falsely imprisoned her because of her lawsuit - adequately pleads concrete harm.

The Defendants next argue that the Plaintiff fails to satisfy the third prong, causality. "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley,* 268 F.3d at 73.  To satisfy the causal element of a retaliation claim, a plaintiff must "introduce evidence sufficient to support the inference that the speech played a substantial part in the adverse action." *Brandon,* 938 F.3d at 40 (internal quotation marks and citation omitted).  *See Washington v. County of Rockland*, 373 F.3d

---

[24] As to the first element, "[i]t is well settled that filing a … lawsuit is constitutionally protected conduct."  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).  The Defendants do not argue otherwise.

310, 321 (2d Cir. 2004) (noting that "plaintiffs must aver some tangible proof demonstrating that their protected speech animated [the adverse action]. They may not rely on conclusory assertions of retaliatory motive," and affirming summary judgment where plaintiff offered insufficient evidence to prove causality in First Amendment retaliation claim).

The Defendants contend that they did not know about the Plaintiff's lawsuit and submit evidence in support. ECF No. 276-1 at 15; ECF No. 276-2 ¶ 80.  Canepari, Harris, Baker, and Tornello each have attested that they were unaware of the Plaintiff's lawsuit when they were dispatched to the Plaintiff's house on May 5, 2018.  ECF No. 277-9, Defs' Ex. O, Canepari Aff. ¶ 6; ECF No. 277-20, Defs' Ex II, Harris Aff. ¶ 7; ECF No. 277-21, Defs' Ex. JJ, Baker Aff. ¶ 7; ECF No. 277-15 at 14, Defs' Ex. W, Tornello Dep.  In response, the Plaintiff points to her affidavit in which she avers that she heard Canepari whisper while putting her in the cruiser "we know about your lawsuit bitch, this is what happens when you sue us," ECF No. 325-1, Pal Aff. ¶ 66, and Tornello's statement to an ER nurse about the Plaintiff's lawsuit ("I was talking to some of my co-workers . . . . and actually they are the ones.").  Tornello BWC 21:32:00-34:00.  As discussed earlier, the Plaintiff's averment about Canepari's alleged comment is unsupported by the audio recordings;  no reasonable juror reviewing these recordings could conclude that Canepari whispered anything to the Plaintiff at the time or that, if he did, anyone could have heard it.  And Tornello's comment is consistent with her deposition testimony that she knew "somebody had a lawsuit pending" but that she didn't know who was being sued and had no details about the complaint before the Plaintiff told her.  ECF No. 277-15 at 14, Tornello Dep.[25]  The Plaintiff has not adduced evidence "sufficient to support the inference" that her lawsuit "played a substantial

---

[25] In any event, Tornello arrived after the Plaintiff was in the ambulance and there is no evidence she was involved in the events that took place before then or that she communicated with the other officers about the Plaintiff's lawsuit.

part in" the Defendants' conduct on May 5, 2018.[26]  *Brandon,* 938 F.3d at 40.  *See Mangiafico v. Blumenthal,* 2007 WL 283115, at *7 (D. Conn. Jan. 30, 2007) (granting summary judgment where Plaintiff offered no "tangible proof" that defendant knew about his lawsuit prior to her decision to transfer him to another facility); *Fisher v. Town of Windsor*, 1997 WL 76669, at *5 (D. Conn. Feb. 7, 1997) (rejecting plaintiff's argument that "her retaliators must have known of her complaints because the filing of her federal suit could not have remained a secret in such a small department" and observing that "[a]lthough knowledge may be shown by circumstantial evidence … there must be some facts in evidence supporting an inference of actual knowledge").[27]

The Plaintiff also alleges that Defendants retaliated against her "for [her] use of profanity which Defendants deemed as being offensive and objectionable."[28]  ECF No. 199 ¶ 328.  The complaint contains no further allegations as to this claim and the record does not support such a claim.  To prevail on a First Amendment retaliation claim, "[t]he plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury. . . . It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the

---

[26] In her opposition, the Plaintiff states that she recognized Canepari because she had seen him at the police station in 2017 and further, that he was an "unnamed Doe defendant" in her lawsuit for his alleged involvement in an attempt to extort money from her.  ECF No. 320 at 2, 15, 17.  But this is not sufficient to raise a reasonable inference that he knew about the lawsuit:  it is undisputed that Canepari was not a named defendant in the prior lawsuit and was not served with process.

[27] The Plaintiff believes that the Defendants continue to retaliate against her.  *See* ECF No. 277-10 at 10, Pal. Dep (refusing to answer question asking where she lived, stating to defense counsel "your clients have threatened to kill me and my children and my husband, and they have persisted in those threats for the past more than five years."); ECF No. 325-3 at 16 (during a deposition of a witness Plaintiff told defense counsel that his clients "have threatened me, my children, my entire family with death, unless we withdraw this lawsuit"); ECF No. 325-1, Pal Aff. ¶¶ 167-68 (averring that she received threatening notes after the May 5 encounter).  Her statements at the depositions were vague, however, and the statements in the affidavit, also vague, do not indicate who sent or authored the alleged threatening notes.

[28] "[T]he First Amendment protects even profanity-laden speech directed at police officers." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003).

retaliatory motive." *Nieves v. Bartlett*, __U.S __, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019) (internal quotation marks and citations omitted).

Here, the Plaintiff fails to show a causal connection between the Defendant's alleged animus and her injury.  At the time of the alleged unlawful entry, the Plaintiff had not yet begun to curse at the officers, and so they could not have unlawfully entered her yard, deck, or house to retaliate against her for profanities.  As for the handcuffing, Officer Harris threatened to place the Plaintiff in handcuffs after she pushed her husband twice, walked away from Harris, appeared to be headed for the deck stairs, and raised her arms.  Moreover, she agreed - initially - to be placed in handcuffs.  No reasonable jury could find that the Defendants placed her in handcuffs in retaliation for her swearing.  Similarly, as to the other alleged unlawful conduct – the tightness of the handcuffs, the tightening of the handcuffs, placing her in the cruiser, and summoning the ambulance – the record  indicates that each of these actions (if in fact the handcuffs were too tight) was likewise taken for specific reasons other than to retaliate for her swearing.  For example, as discussed above, Canepari asked Baker if he could place the Plaintiff in the cruiser so that they could conduct a separate interview with Yadav, who was becoming distracted by the Plaintiff's swearing (at one point interrupting his interview to chastise the Plaintiff, explaining to the officers that he wanted her to be "polite").  And by the time the ambulance was summoned, the Plaintiff was shrieking and repeatedly kicking the partition in the back of the cruiser and the officers had commented multiple times that she smelled of alcohol and was intoxicated.  Finally, the video and audio contain no suggestion that the officers commented on or otherwise reacted to her use of profanities, except on one occasion when the Plaintiff used a profanity and asked Harris, "What's your fucking name asshole?" and he responded "Well, it's not what you're calling me. I can guarantee you that.  That's not my name."  Harris BWC 20:07:05-12.  In short, no reasonable juror

could find that the officers took the actions that they did to retaliate against the Plaintiff for the content of her speech on May 5, 2018.  Because the record includes no evidence of a connection between the Plaintiff's protected speech and the alleged concrete harm, summary judgment is granted as to Count 2.

### Count 3:  Excessive Force

The Plaintiff alleges that the Defendants used excessive force.[29]  Specifically, the Plaintiff alleges that Harris and Baker "grabbed" her arm, Harris "twisted" her arm behind her back, Harris twisted her handcuffed arms, the handcuffs were too tight, and when she said she was in pain, Harris and Canepari tightened them further. ECF No. 199 ¶¶ 67-68, 73, 79, 82-83, 146.[30]

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because the Fourth Amendment protects against unreasonable seizures, it has long been recognized that the Fourth Amendment is violated if the police use excessive force against a free person for the purpose of arresting or restraining his or her freedom of movement." *Est. of Devine*

---

[29] In her opposition, the Plaintiff states that she "cross-moves" for summary judgment as to this count.  ECF No. 320 at 22.  But she did not file a Local Rule 56(a)1 statement.  She simply asserts in her opposition that "[t]he evidence is undisputed that the Defendants used excessive force upon Plaintiff."  ECF No. 320 at 22.  This is procedurally improper.  The Plaintiff's request that the Court grant summary judgment in her favor is denied.

[30] To the extent that she alleges that Canepari and Harris "dragged" her off the deck, ECF No. 199 ¶ 86, the video evidence fails to support this claim. As to her allegation that the defendants "violently pushed" her into the cruiser, the video footage indicates that when the Plaintiff resisted getting in the vehicle, the defendants forcefully ushered her body into the backseat while protecting her head.  This limited physical contact was permissible.  *See Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir. 1995) ("[B]ecause she would not leave the car on her own, Backaus determined that he would have to remove her forcibly. He wrapped his arm around her neck, shoulder, and arm, and pulled her from the car. The intrusion on Mrs. Lennon's Fourth Amendment rights, if any, was extremely limited.").  In any event, a reasonable officer could conclude that putting her in the cruiser in that manner was constitutional. *See id.* (directing entry of summary judgment on qualified immunity grounds); *Brown v. City of N.Y.*, 862 F.3d 182, 192 (2d Cir. 2017) ("Again, th[e] inquiry is whether every reasonable police officer would view the force used by [the officers], in the circumstances in which that force was applied, as excessive according to clearly established law.").  Therefore, Canepari and Harris are entitled to qualified immunity as to the Plaintiff's claim about the manner in which she was placed in the car.

*v. Fusaro*, 2016 WL 183472, at *4 (D. Conn. Jan. 14, 2016), *aff'd*, 676 Fed. App'x 61 (2d Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

Whether police officers' use of force is "excessive" must be judged by "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397.  "[T]he right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and thus "determining whether the amount of force an officer used is reasonable 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Graham*, 490 U.S. at 396). A court must give "careful attention to the facts and circumstances of each particular case," including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

*Handcuffing*

In determining whether handcuffing rises to the level of a Fourth Amendment violation, courts consider: (1) whether the handcuffs were unreasonably tight; (2) whether the defendants ignored the individual's complaints about her handcuffs; and (3) the degree of injury to the individual's wrists.  *Cugini*, 941 F.3d at 612.  No one factor is dispositive, and the test is ultimately one of reasonableness that "is not limited to a factual checklist." *Id.* at 613.

> The question is ... whether an officer reasonably should have known during handcuffing that his use of force was excessive. A plaintiff satisfies this requirement if either the unreasonableness of the force used was apparent under the

circumstances, or the plaintiff signaled her distress, verbally or otherwise, such that a reasonable officer would have been aware of her pain, or both.

*Id.*; *see also Case v. City of New York*, 233 F. Supp. 3d 372, 385 (S.D.N.Y. 2017) ("Although handcuffs must be reasonably tight to be effective, overly tight handcuffing can constitute excessive force.")(internal quotation marks omitted).   On the record before me, genuine issues of material fact exist as to whether the Defendants used excessive force in the manner in which they handcuffed the Plaintiff.[31]   Although the Defendants maintain that they double locked the handcuffs and checked to make sure they were not too tight, the video and audio evidence shows that almost immediately after being handcuffed, and continuing thereafter, the Plaintiff loudly and repeatedly alerted the Defendants that the handcuffs were too tight and that her hands hurt. *Cugini*, 941 F.3d at 608 ("A plaintiff must . . . demonstrate that the officer was made reasonably aware that the force used was excessive.  A plaintiff satisfies this requirement if either the reasonableness of the force used was apparent under the circumstances, or the plaintiff signaled her distress, verbally or otherwise, such that a reasonable officer would have been aware of her pain or both.") The Plaintiff testified in her deposition that Harris and Canepari tightened the handcuffs and at no

---

[31] It is unclear from the Plaintiff's complaint whether she is challenging the decision to handcuff her at all, but any such challenge would fail on this record.  First, a police officer's decision to use handcuffs on a suspect when conducting an investigation is not, by itself, excessive force.  It is only when aggravating factors are present - such as excessive tightness, complaints of pain by the plaintiff, or the plaintiff's suffering more than temporary injury - that handcuffing can rise to the level of a Fourth Amendment violation.  *See, e.g.*, *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 105 (S.D.N.Y. 2016) (noting that the requirement of more than de minimis injury is "particularly important because in order to be effective, handcuffs must be tight enough to prevent the arrestee's hands from slipping out," and that "there is a consensus among courts in this Circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort.") (internal quotation marks, citations and alterations omitted).  Second, the body worn camera footage shows that the officers' original decision to place the Plaintiff in handcuffs was reasonable, or at least that they would have qualified immunity with respect to that decision.  The officers were responding to a suspected domestic violence incident and reasonably believed, based on the content of the 911 call, that the Plaintiff had been involved in (possibly as the victim of) a violent incident.  When they arrived at the house, the Plaintiff was hostile, belligerent, and apparently intoxicated; her husband told the officers that the Plaintiff had been drinking and the video footage makes clear that the officers smelled alcohol on the Plaintiff's breath.  (Plaintiff's averments that she was not actually intoxicated do not raise genuine factual disputes about what the officers smelled or what her husband said.)  The Plaintiff was ignoring the officers' instructions as to her movements, pushed her husband twice in their presence, and at one point, raised her arms.  When Harris then threatened to handcuff her, she agreed to be handcuffed and initially appeared to cooperate by placing her hands behind her back.  Under these circumstances, the decision to place her in handcuffs was reasonable.

point loosened them.  ECF No. 277-10 at 82, 133, Pal Dep.  And while Baker did not handcuff her and did not spend as much time in close contact with her as did Harris and Canepari, the body worn camera footage shows he was in close proximity and had ample opportunity to intervene to prevent or interrupt the excessively tight handcuffing about which she testified.  *See Jackson v. Tellado*, 295 F. Supp.3d 164, 174 (E.D.N.Y. 2018)("To establish a claim for excessive force under a failure to intervene theory, a plaintiff must prove that the officer (1) observed, or had reason to know of, the alleged violation, and (2) there was a realistic opportunity to intervene to prevent the harm from occurring.").[32]  She asserts that as a result she suffered career-altering injuries to her right hand.  *Id.* at 29-31.[33]  Because there are genuine issues of material fact in dispute, summary judgment is not warranted as to the Plaintiff's excessive force claim relating to whether the handcuffs were too tight and whether the Defendants tightened them further in response to her complaints or twisted her arms to cause pain while she was cuffed.[34]

### Count 4:  Unlawful Entry and Seizure

The Plaintiff alleges that the Defendants entered her home unlawfully, "falsely arrested, seized and imprisoned plaintiff in her home, the police car, in the ambulance and in the ER."  ECF No. 199 ¶ 335.

---

[32] Although the Plaintiff did not plead a distinct failure-to-intervene claim in her complaint, excessive force and failure to intervene are closely related theories, and given my obligation to interpret the pro se Plaintiff's allegations to raise "the strongest arguments that they suggest," *Willey*, 801 F.3d at 62, I interpret her complaint to make such a claim against Baker.

[33] The body worn camera footage suggests that Defendants Canepari and Harris doubted the sincerity of the Plaintiff's cries of pain due to the handcuffs, with Canepari saying at one point that she was a "drama queen" and with Harris saying at another that he had checked the handcuffs to ensure that they were not too tight.  But given the Plaintiff's contrary version of events and the fact that the body worn camera (understandably) did not zoom in on the Plaintiff's wrists, only a jury may decide whether the Plaintiff's cries of pain were genuine and whether the amount of force used was excessive.

[34] The existence of these factual disputes precludes qualified immunity.  *See White v. Brown*, 2023 WL 1967081, at *10 (D. Conn. Feb. 13, 2023) (questions of material fact as to whether defendants double locked the handcuffs on plaintiff's wrists, whether defendants heard plaintiff screaming for help, and whether defendants ever loosened the handcuffs precluded the Court from determining whether the defendants were entitled to qualified immunity).

*Unlawful Entry*

The Defendants argue that their entry was lawful because it fell within the "exigent circumstances" exception to the warrant requirement, or in the alternative, they are entitled to qualified immunity because it was objectively reasonable for the officers to have believed that the entry was legal under this exception.[35]

"[W]arrants are generally required to search a person's home . . . ." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "For the warrantless entry of a home to be rendered reasonable despite the presumption to the contrary, it must 'meet an exception to the warrant requirement.'" *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020) (quoting *Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003)). "Under the emergency aid doctrine, exigent circumstances exist permitting entry if law enforcement has probable cause to believe that a person is 'seriously injured or threatened with such injury.'" *Chamberlain*, 960 F.3d at 105 (quoting *Brigham City*, 547 U.S. at 403); *see also Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (warrantless entry may be "justified by any emergency threatening life or limb"); *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) ("[p]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance.") (internal quotation marks and citations omitted)). Probable cause for a warrantless entry under the emergency aid exception "requires finding a probability that a person is in danger." *Kerman v. City of New York*, 261 F.3d 229, 236

---

[35] The Defendants appear to argue that the alleged unlawful entry was limited to Canepari's and Harris's entry into the Plaintiff's house. ECF No. 276-1 at 23-24. To be clear, however, the Plaintiff alleges that the Defendants entered her backyard and deck, ECF No. 199 ¶¶ 53, 55, and the video footage shows that the three officers entered her gated backyard and then the deck attached to her house. This area constitutes curtilage protected by the Fourth Amendment. *Brocuglio v. Proulx*, 67 Fed. Appx. 58, 61 (2d Cir. 2003)("[A] fenced-in backyard is curtilage entitled to Fourth Amendment protection."); *Hardesty v. Hamburg Tp.*, 461 F.3d 646, 652-53 (6th Cir. 2006), *abrogated on other grounds*, *Florida v. Jardines*, 569 U.S. 1 (2013)(back deck part of curtilage).

(2d Cir. 2001) (internal quotation marks omitted). "For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time." *Id.* at 235. The "core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *Chamberlain*, 960 F.3d at 106. "Courts must apply an objective standard to determine the reasonableness of the officer's belief. . . . However, [t]his probable cause requirement[ ] must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney*, 133 F.3d at 196-97 (citations omitted).

Officers are entitled to qualified immunity under § 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *D.C. v. Wesby*, ___U.S.___, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (internal quotation marks and citations omitted). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (internal quotation marks and citations omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citation omitted). The Second Circuit "exercise[s] particular caution before rejecting an officer's claim to qualified immunity in the Fourth Amendment context, in which it is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts." *Shakir v. Stankye*, 805 F. App'x 35, 37–38 (2d Cir. 2020) (internal quotation marks and citations omitted). "As such, a

plaintiff attempting to overcome an officer's qualified immunity must generally 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'" *Id.* (quoting *Wesby*, 138 S. Ct. at 590).

I conclude that the officers here are entitled to qualified immunity. Although the Plaintiff argues that her husband had explained the "circumstances of the misdialed 911," obviating any emergency response, the undisputed evidence is that the Defendants were dispatched in response to a 911 call in which a woman said "hit me you asshole," which suggested an immediate threat of physical harm. The woman said nothing more and the caller hung up the phone. When Canepari arrived, he heard a woman's voice from inside the house loudly say, "Shut up!" "Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Tierney*, 133 F.3d at 197 (according quality immunity on unlawful entry claim where officer responded to what he was told was a "bad" domestic disturbance, neighbors reported that shouting had ended right before his arrival, and officer heard nothing on approach and observed broken window pane). The Court is not aware of any case law, nor has the Plaintiff cited any, which would have made it clear to a reasonable officer at the time that entry under these circumstances would violate Plaintiff's clearly established rights. *See Wesby*, 138 S. Ct. at 590 (noting "the need to identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment"). On the record before me, an objectively reasonable law enforcement officer could have believed that entry into the Plaintiff's home and curtilage was justified under the "emergency aid" exception.[36]

---

[36] Insofar as the Plaintiff asserts that the Defendants' true motivation was retaliation for her lawsuit, *see* ECF No. 199 at ¶ 267, this argument fails for reasons I discussed earlier and also because the Fourth Amendment's protections do

*False Arrest*

The Defendants argue that they are entitled to summary judgment on the Plaintiff's false arrest claim because she was the subject of an "investigatory detention" and was not arrested.[37] ECF No. 276-1 at 9, 17.

A Fourth Amendment "seizure" occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not at liberty to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "There are two relevant types of seizures, each of which requires a different level of justification: (i) an investigatory (or *Terry*) stop . . . and (ii) an arrest[.]" *Smith v. Vill. of Brockport*, 2022 WL 597465, at *11-12 (W.D.N.Y. Feb. 28, 2022) (citing *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)). Arrests require probable cause, while a police officer may make a *Terry* stop "as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense." *Grice v. McVeigh,* 873 F.3d 162, 167 (2d Cir. 2017). The standard for reasonable suspicion is "not high," and is less than what probable cause requires. *Id.* (internal quotation marks and citation omitted). "Whether an officer's suspicion is 'reasonable' is an objective inquiry based on the totality of the circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training." *Id*. (citing *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)).

---

not depend upon an assessment of a police officer's subjective motivations. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action," and "[t]he officer's subjective motivation is irrelevant." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (applying the emergency-aid exception). "[I]f the facts known to a police officer would be sufficient for an objectively reasonable officer to believe his actions to be constitutional, then qualified immunity applies regardless of the actual officer's motives." *McEvoy v. Matthews*, 2017 WL 3597473, at *5 (D. Conn. Aug. 21, 2017) (citing *Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002)).

[37] The Defendants state elsewhere in their brief that they had "probable cause to take plaintiff into custody" but do not identify the crime(s) for which they had probable cause. ECF No. 276-1 at 21, 22.

"A *Terry* stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." *Grice*, 873 F.3d at 167.   In determining whether a *Terry* stop is so intrusive as to become an arrest, the Court looks to:

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

*Id.* (internal punctuation and citations omitted).

"Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest." *Id.*  "But a police officer, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *Id.* (internal quotation marks and citations omitted).  "There is no bright-line rule regarding the use of handcuffs during a *Terry* stop." *Petaway v. City of New Haven*, 2020 WL 1969396, at *2 (D. Conn. Apr. 24, 2020).   "In certain unusual circumstances, we have therefore held that handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice,* 873 F.3d at 167-68. "We ask if police have a reasonable basis to think that the person detained poses a present physical threat and handcuffing is the least intrusive means to protect against that threat." *Id.* at 168 (internal quotation marks omitted) (observing that defendant officer's "intent to handcuff Grice for protection rather than pursuant to arrest is clear: he never administered a *Miranda* warning, and he explained to Grice that he was handcuffing him 'for my safety and your safety ... [u]ntil I find out what's going on.'")  "The scope of the detention must be carefully tailored to its underlying justification." *Florida. v. Royer*, 460 U.S. 491, 500 (1983); *see United States v. Sharpe*, 470 U.S. 675, 685 (1985) (while brevity of investigative detention is important factor in determining

whether detention is unreasonable, courts must also consider purposes to be served by stop as well as time reasonably needed to effectuate those purposes).

I find instructive the Second Circuit's decision in *Grice*.   In that case*,* the Court reversed the district court's denial of qualified immunity as to the plaintiff's false arrest claim.  The Court concluded that the plaintiff, despite being handcuffed, was subject to an investigatory detention supported by reasonable suspicion that never ripened into an arrest.  In so concluding, the Court found that the fact that the defendant's intent in handcuffing the plaintiff was "for protection rather than pursuant to arrest is clear: he never administered a *Miranda* warning, and he explained to Grice that he was handcuffing him 'for my safety and your safety ... [u]ntil I find out what's going on.'"  *Grice*, 873 F.3d at 168.  The defendant released the plaintiff after the investigation was complete and the Court found that "thirty-three minutes was not an unreasonable interval to keep the handcuffs on while officers and a dog searched the [train] track."  *Id.* (citing cases).  The Court found that the defendants were entitled to qualified immunity on the grounds that "[i]t cannot be said that every reasonable officer in their circumstances would know that the conduct complained of violated clearly established law." *Id.* at 165.

Here, too, I find that it cannot be said that every reasonable officer faced with the circumstances presented to the Defendants would have known that the conduct complained of violated clearly established law.  The Defendants responded to a suspected domestic assault situation, which harbored the possibility of physical harm.  In their effort to investigate the matter, they were confronted with a hostile, belligerent woman, the Plaintiff, who - in front of the officers - shoved her husband twice and told him to shut up, and escalated the situation by refusing to answer their questions, telling them to get out, cursing them, and walking away.  Faced with the Plaintiff's erratic and noncompliant conduct, they warned her that if she didn't calm down, they

would put her in handcuffs and she expressly agreed to be put in the handcuffs.  Harris told her,

her husband, and her mother that he would remove the cuffs if she calmed down and cooperated

with their investigation.  Harris BWC 20:05:56.  But she did not calm down, making it difficult

for the officers to question her husband, who remained nearby and was repeatedly distracted by

her conduct.  She was placed in the cruiser because of the noise she was making by her screaming

and in an effort to separate her from her husband, who the officers wanted to question separately

and without the distraction of Plaintiff's screaming and profanities.  She remained handcuffed in

the cruiser for approximately 35 minutes during which time her agitation and screaming increased

and she could be seen kicking the partition.  During this time, the officers were investigating the

circumstances of the 911 call by interviewing her husband, mother, and children to ascertain

whether there was a safety concern.  And part of the time was spent waiting for an ambulance.

The duration of the detention and the diligence with which the officers pursued their investigation

during the detention - all captured on video - weigh in favor of a conclusion that it was a reasonable

investigatory stop.  Her detention did not take longer than "reasonably needed to effectuate [the]

purposes" of the stop.  *Sharpe*, 470 U.S. at 685.  On this record, the detention of the Plaintiff did

not ripen into an arrest and was reasonable under all the circumstances.  *Grice*, 873 F.3d at 168.[38]

   *Illegal Seizure for Involuntary Medical Examination*

   The Plaintiff next claims that the warrantless seizure for the purpose of involuntarily

hospitalizing her also violated the Fourth Amendment.  The Defendants move for summary

judgment on the grounds that based on the Plaintiff's concerning conduct, they reasonably believed

that the Plaintiff presented a danger to herself or others.

---

[38] Further, because I find below that the officers had at least arguable probable cause to justify a mental health seizure, and thus take her into custody for an emergency examination and forcible transport to the hospital under Conn. Gen. Stat. § 17a-503(a), their decision to keep her in handcuffs until the ambulance arrived and she could be placed in restraints on the stretcher and then transported to the hospital was reasonable.

The Fourth Amendment protects against unreasonable searches and seizures "whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016). "A warrantless seizure for the purpose of involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (internal quotation marks omitted). The Fourth Amendment requires a "probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Waananen v. Barry*, 343 F. Supp. 2d 161, 170 (D. Conn. 2004) (internal quotation marks omitted). "To determine whether probable cause existed to justify a mental health seizure, courts must look to 'the specific observations and information available' at the time of the seizure." *Aouatif v. City of New York*, 2019 WL 2410450, at *9 (E.D.N.Y. May 31, 2019) (quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016), *aff'd*, 811 F. App'x 711 (2d Cir. 2020)).

Officers are "entitled to the protection of qualified immunity unless the unlawfulness of their actions was apparent in light of preexisting law." *Doninger v. Niehoff*, 642 F.3d 334, 351 (2d Cir. 2011). An officer's decision to make a warrantless seizure is objectively reasonable and thus entitled to qualified immunity "if there was 'arguable' probable cause ... that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 86–87 (2d Cir. 2007)). However, arguable probable cause "should not be misunderstood to mean 'almost' probable cause" and if "officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause,

the fact that it came close does not immunize the officer." *Id.* (quoting *Jenkins*, 478 F.3d at 86-87).

Even when the evidence is viewed in the light most favorable to, and all inferences are drawn in favor of, the Plaintiff, the Defendants had at least arguable probable cause. Although the Plaintiff insists that she did not pose a risk of harm to herself or others, asserting that she displayed no violent behavior and claiming that the Defendants created false documents to substantiate her hospitalization,[39] the Fourth Amendment requires only a "probability or substantial chance of dangerous behavior, not an actual showing of such behavior" to support a seizure for involuntary transport. *Waananen*, 343 F. Supp. 2d at 170 (internal quotation marks omitted). The facts known to the Defendants permitted reasonable officers to think that probable cause existed to believe that she posed a danger to herself or others. She was belligerent, hostile, and according to her husband and the officers' own observations, had been drinking. She demonstrated an unusual level of agitation and displayed erratic and irrational behavior, which included stating that she wanted to be arrested, screaming profanities at the officers, shoving her husband, telling him and her mother to shut up and get away, and kicking the inside of the cruiser. At most, reasonable officers would disagree on whether the Defendants violated the Plaintiff's rights, which is sufficient to sustain the defense of qualified immunity. *See Doninger*, 642 F.3d at 349. Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's claim that they violated her Fourth Amendment right to be free from an unreasonable seizure.

**Count 5: Malicious Prosecution and Malicious Abuse of Process under § 1983**

The Plaintiff alleges that the Defendants "created reports, statements, document[s] and

---

[39] Specifically, the Plaintiff points to the statement in the § 17a-503(a) form that she told officers she would "kill" you. ECF No. 320 at 24; ECF No. 279-5. But that form was completed after the Defendants had summoned the ambulance and helped place her inside. And in any event, the undisputed facts of the Plaintiff's behavior - without the statements in the form - constituted at least probable cause.

incident reports which contained false and misleading information about the Plaintiff" and filed these reports "with governmental agencies, hospitals, ERs, insurance prov[id]ers, and agencies in order to obtain collateral objectives, including, but not limited to terrorizing, intimidating and instilling fear in the plaintiff[] and to cover up their own unlawful acts."  ECF No. 199 ¶¶ 339-340.[40]  In her opposition, she focuses only on Harris and Canepari and argues that they "conspired and created a § 17a-503(a) form replete with demonstrably false information."  ECF No 320 at 25.[41]

"To state a § 1983 malicious prosecution claim a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law. . . . Under Connecticut law, a malicious prosecution claim requires proof that (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice."  *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022).

"The torts of malicious prosecution and abuse of process are closely allied. While malicious prosecution concerns the improper issuance of process, the gist of abuse of process is the improper use of process after it is regularly issued." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (internal

---

[40] The Plaintiff also alleges that Baker, Canepari and Harris "engaged in malicious abuse of process [by making] false reports to CT-DCF and NY-OCFS, which in turn result in the malicious prosecution of the Plaintiff for 'child neglect." ECF No. 320 at 25.  As noted above, the Plaintiff previously alleged Baker made a false report to the Connecticut Department of Children and Families.  Fourth Amended Compl. ECF No. 53 ¶¶ 97-102.  I dismissed that claim because she failed to provide the Defendants with the necessary authorizations to defend against such a claim.  ECF Nos. 123, 173.  And I instructed the Plaintiff not to include the claim in her Consolidated Amended Complaint and explicitly ordered that "she may not add parties, claims or allegations beyond those presently already embodied in the two actions."  ECF No. 170 at 4-5.  Not only did she include the DCF claim in the operative complaint, she augmented it to allege that Canepari and Harris also made false reports to child protection agencies.  ECF No. 199 ¶¶ 207-08, 215.  These claims are foreclosed by my earlier ruling.
[41] Because the Plaintiff does not address Baker, Count 5 is dismissed as to him for lack of personal involvement.

quotation marks, citation and alteration omitted).  "[A]n abuse of process claim may only be based on events subsequent to initiation [of judicial process]." *Miles v. City of Hartford*, 445 Fed. App'x 379, 383 (2d Cir. 2011) (emphasis in original).  "Under Connecticut law, a plaintiff claiming malicious abuse of process must show that legitimate legal process was used primarily to accomplish a purpose for which it was not designed." *Wall v. Cetran*, 100 F.3d 943, 1996 WL 47974 (2d Cir. 1996) (unpublished opinion; internal quotation marks omitted).

The Plaintiff's claim for malicious prosecution fails because no criminal proceedings were initiated against her, a required element for this claim.  Her abuse of process fails because no judicial process was abused.  *See Schofield v. Magrey*, 2015 WL 521418, at *14 (D. Conn. Feb. 9, 2015) (granting summary judgment as to plaintiff's claim that defendants' allegedly unwarranted request to transport Plaintiff under § 17a-503(a) constituted abuse of process because "it is undisputed that Plaintiff was not arrested and no legal action was initiated against him and therefore there was no judicial process that could have been abused"); *Larobina v. McDonald,* 274 Conn. 394, 407 (2005) ("[T]o prevail on an abuse of process claim, the plaintiff must establish that the defendant used a *judicial process* for an *improper purpose.*" (emphasis in original)).  Summary judgment is granted as to Count 5.

### Count 6: *Monell*

The Plaintiff alleges that the "refusal of the Chief of Police, Board of Selectmen and Board of Police Commissioners of the defendant TOWN OF WILTON to meaningfully investigate the plaintiff's complaints of unlawful actions and misconduct of its employee officers demonstrates a deliberate lack of oversight, training, and supervision of its employees by defendant."  ECF No. 199 ¶ 354.  According to the Plaintiff, the Town of Wilton has a policy and custom of "condoning, ignoring, and refusing to correct or investigate unconstitutional conduct and unlawful actions of

its police officers." *Id.* ¶ 355.  The Defendants move for summary judgment on the grounds that the Plaintiff has failed to allege sufficient facts to establish there was a policy, practice, or custom that caused the purported unconstitutional misconduct she alleges.

A municipality "may not be sued under section 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978).  Under *Monell*, a municipality is subject to suit under section 1983 only if the "execution of [the] government's policy or custom ... inflicts the [alleged] injury." *Id.* "To satisfy this requirement, general and conclusory allegation[s] of an unconstitutional policy or custom are insufficient. . . . Rather, a plaintiff must identify either an express rule or regulation, a practice that was so persistent or widespread as to [carry] the force of law, or misconduct of subordinate employees that was so manifest as to imply the constructive acquiescence of senior policy-making officials." *Swinton v. Livingston Cnty*, 2023 WL 2317838, at *1 (2d Cir. Mar. 2, 2023) (internal quotation marks and citations omitted).  "A municipal policy or custom may be established by any of the following: 1) a formal policy, officially promulgated by the municipality ...; 2) action taken by the official responsible for establishing policy with respect to a particular issue ...; 3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law ...; or 4) a failure to train or supervise that amounts to deliberate indifference to the rights of those with whom the municipality's employees interact[.]" *LeClair v. Raymond*, 2021 WL 2682286, at *16 (N.D.N.Y. June 30, 2021) (internal quotation marks omitted).

In her opposition, the Plaintiff maintains that the Town has a "policy of knowingly and purposely refusing to investigate citizen complaints against its employee police officers." ECF No. 320 at 27.  She argues she made complaints about the "unlawful actions of Wilton Police and ambulance employees on 4-29-15 and 5-5-18" but "Defendants Town of Wilton, Wilton Police

and [Police Chief] John Lynch have neither investigated [my] complaints nor taken any corrective actions against their employees and ambulance personnel." ECF No. 320 at 30. She states that as to the May 5, 2018 incident, she "repeatedly informed" Tornello that Kennedy, Bryson, and Downs had assaulted her[42] but Tornello failed to document or investigate her complaints. ECF No. 320 at 27. She also cites the deposition testimony of Lynne Vanderslice, the First Selectwoman of the Town of Wilton, that she had not made "any effort to follow up and find out if there was any action, investigation, disciplinary action" taken in response to the Plaintiff's May 5, 2018 encounter. ECF No 328-2 at 25.

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).

The Plaintiff's *Monell* claim fails because she has not provided sufficient evidence to suggest a causal link between any policy and custom and her alleged constitutional injuries.[43] The sole evidence she proffers as evidence of an official custom or policy is her own treatment. But a single case is insufficient to establish the existence of such a practice. *See Nguedi v. Caulfield*, 813 Fed. App'x 1, 3 (2d Cir. 2020) ("While Nguedi points to his own treatment as evidence of a

---

[42] Presumably referring to the "mileage" comment, the Plaintiff states that Kennedy "directly threatened Plaintiff with sexual assault Plaintiff [sic] in the ambulance while Tornello was present, and Tornello heard and responded inappropriately to [t]his. At no time did Defendant Tornello documents these complaints, include this information in her incident report, nor initiate any investigation into the complaints." ECF No. 320 at 27. The Plaintiff's characterization of Kennedy's comment is unsupported by the record and in any event, the Plaintiff's claim that her complaint regarding the events of May 5, 2018 was not investigated does not help her *Monell* claim, because any failure to investigate those events after they occurred could not have caused them. (I do not rely on the document submitted as an attachment to the Defendants' reply brief in resolving this issue.)

[43] "There are two ways to plausibly plead deliberate indifference with respect to failure to supervise/discipline. First, a plaintiff may plead (1) that there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that the municipality *consistently failed to investigate* those allegations. Second, a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality *consistently failed to discipline* those involved." *Tieman v. City of Newburgh*, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (emphasis in original). The Plaintiff does neither.

custom, a single case is insufficient to establish the existence of such a practice."); *Golino v. City of New Haven*, 761 F. Supp. 962, 973 (D. Conn.), *aff'd*, 950 F.2d 864 (2d Cir. 1991) (plaintiff's "own arrest, assuming for the argument that it was unconstitutional, does not establish a policy or custom"); *Sarus v. Rotundo*, 831 F.2d 397, 402 (2d Cir. 1987) (finding that there was no *Monell* claim where "the only relevant evidence presented by appellees was the manner in which they themselves were arrested").  Further, even if one could consider the alleged failure to investigate the 2015 incident involving the Plaintiff as a sufficient basis for a "specific municipal policy or custom," *Golphin v. City of New York*, 2011 WL 4375679 *3 (S.D.N.Y. Sept. 19, 2011), under *Monell* (a theory the Plaintiff suggests in her summary judgment papers but not in her complaint), the Plaintiff has failed to submit any evidence suggesting that the failure to investigate that earlier incident – which involved different officers and a different claim of excessive force – proximately caused Canepari, Harris, and Baker to apply handcuffs to her wrists excessively tightly on May 5, 2018.  *See Pal v. Cipolla*, 18cv616, ECF No. 177-1 para. 74, 80 (Plaintiff's affidavit from earlier case alleging that Defendant Cipolla "grabbed [her] right upper arm, twisting it forcefully," that she was "dragged" out of her house and that her head and right side of her upper body were "slammed" against the door frame, causing injury; but not alleging excessively tight handcuffing); *Pal v. Cipolla*, 18cv616, ECF No. 49 (complaint not alleging tight handcuffing); *Cash v. County of Erie*, 654 F.3d 324, 342 (2d Cir. 2011)("proximate cause' … fairly describes a plaintiff's causation burden with respect to a municipal liability claim under [Section] 1983.").  Summary judgment is granted as to Count 6.

### Count 7:  Conspiracy

The Plaintiff alleges that the Defendants entered into a conspiracy to deprive her of her civil rights.  As neither her complaint nor her brief specifies the statutory basis for this claim, I

analyze it under both Section 1983 and Section 1985(3).

To prove a claim of conspiracy under 42 U.S.C. § 1983, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted). "To survive a motion for summary judgment, [the] plaintiff's evidence of a [Section] 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Falls v. (Police Officer) Detective Michael Pitt*, 2021 WL 1164185, at *58 (S.D.N.Y. Mar. 26, 2021) (internal citations omitted).

A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Britt v. Garcia,* 457 F.3d 264, 269 n.4 (2d Cir. 2006) (internal quotation marks omitted). "The conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (internal quotation marks and citation omitted).

Vague and unsupported assertions of a claim of conspiracy will not suffice under either Section 1983 or Section 1985(3). *See, e.g.*, *Wang* v. *Miller*, 356 Fed. App'x 516, 517 (2d Cir. 2009) (summary order); *Webb* v. *Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003).

The Defendants argue that there is no record evidence tending to show a meeting of the minds between any of the Defendants, "'such as that defendants entered into an agreement, express

or tacit, to achieve the unlawful end,' augmented by 'some details of time and place and the alleged effects of the conspiracy.'" *K.D. ex rel. Duncan* v. *White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (quoting *Romer* v. *Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)).

In opposition,[44] the Plaintiff points to her testimony that Canepari stated that he knew about the lawsuit, Tornello's statement to the ER nurse,  Kennedy's purported statement that "we know, that's why we're here," and her statement that she "saw Mark Canepari mouth the words 'we have to cover' to Defendants Drew Kennedy and Joseph Bryson prior to exiting the ambulance."  ECF No. 320 at 26.  But as noted, her testimony about Canepari's "whispering" does not survive a review of the audio, and Tornello's statement at the hospital does not suggest that Canepari, Harris, and Baker conspired to enter the Plaintiff's home, place her in handcuffs, or place her in an ambulance.  And the alleged comments by Kennedy and Canepari are too slim and speculative a reed, even when viewed in the light most favorable to the Plaintiff, to support the inference of the existence of an agreement to deprive her of her constitutional rights or overt acts in furtherance of the alleged conspiracy.  *See Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003)(to sustain a Section 1985 conspiracy claim, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." (internal quotation marks omitted)).  Summary judgment is granted as to Count 7.

**Count 8: Assault and Battery**

In Count 8, the Plaintiff alleges assault and battery.  Her opposition makes clear that this claim is premised on her allegations about the handcuffs.  *See* ECF No. 320 at 33-34. [45]

---

[44] The Plaintiff gives scant attention to the Defendants' argument, dedicating to it just two paragraphs in her brief, and fails to offer any legal authority or even to identify the statute under which she brings her conspiracy claim. See ECF No. 320 at 25-26.

[45] The Defendants moved for summary judgment as to all allegations underlying the Plaintiff's assault and battery claim but as noted, the Plaintiff only addressed her allegations that the handcuffs were too tight.  ECF No. 320 at 33.  Thus, I conclude that the Plaintiff has abandoned any claims concerning the manner she was placed in the cruiser and/or on the gurney. *See, e.g., Fletcher v. City of New London,* 2018 WL 4604306, at *13 (D. Conn. Sept. 25,

To establish a claim for assault and battery, a plaintiff "must prove that defendants applied force or violence to her and that the application of force or violence was unlawful." *Williams v. Lopes*, 64 F. Supp.2d 37, 47 (D. Conn. 1999).  Notably, "federal judges in Connecticut have assumed that Fourth Amendment excessive force claims and state law assault and battery claims are functionally identical." *Muschette on behalf of A.M. v. Town of West Hartford*, 2020 WL 1452344, at *5 (D. Conn. Mar. 25, 2020).

As discussed above, genuine issues of material fact preclude summary judgment with respect to whether Canepari and Harris used excessive force in handcuffing the Plaintiff and whether Baker failed to intervene to stop a constitutional violation. Accordingly, because genuine issues of material fact preclude summary judgment on this claim in Count 3, summary judgment is also denied as to this claim.  *See Jackson v. Town of Bloomfield*, 2015 WL 1245850 (D. Conn. Mar. 18, 2015) (denying summary judgment as to assault and battery claim "having already found a genuine dispute ... as to the reasonableness of the force used by" the officers).

### Counts 9 and 10: Negligent and Intentional Infliction of Emotional Distress

To prevail on a claim for negligent infliction of emotional distress, a plaintiff must show that a "defendant should have realized that [his] conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446 (2003) (internal quotation marks and citation omitted).

To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that

---

2018)(where plaintiffs have failed to respond to the Defendants' challenge to their claims on summary judgment , the Court concluded that plaintiffs have abandoned the claim.); *Anti–Monopoly, Inc., v. Hasbro, Inc*., 958 F. Supp. 895, 907 n.11 (S.D.N.Y.) ("the failure to provide argument on a point at issue constitutes abandonment of the issue"), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).

emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Fernandez v. Clean Harbors Envtl. Servs., Inc*., 2006 WL 8447751, at *2 (D. Conn. May 30, 2006) (citations omitted). Rather, the conduct must be "of a nature that it is especially calculated to cause, and does cause, mental distress of a very serious kind." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000).

Summary judgment is denied on these counts insofar as they are premised on her excessive force claim as to the handcuffs, as to which I have found genuine factual disputes. "Courts in this District have determined that use of excessive force also can state a claim for negligent infliction of emotional distress." *Bryant v. Hartford*, 2021 WL 4477311, at *14 (D. Conn. Sept. 30, 2021) (internal quotation marks and citation omitted). The use of excessive force can likewise support a claim of intentional infliction of emotional distress. *See Doe v. Smereczynsky,* 2018 WL 4266084, at *8 (D. Conn. Sept. 6, 2018) (denying summary judgment and permitting "intentional infliction of emotional distress claim to proceed based on essentially the same facts that support the excessive force claim"; citing cases); *Betancourt v. Slavin*, 676 F. Supp. 2d 71, 81 (D. Conn. 2009) ("Because summary judgment was denied in plaintiff's excessive force claim, the Court cannot grant summary judgment on the intentional infliction of emotional distress claim."). While there

may be some claims of excessive force that involve circumstances that would not satisfy the extreme and outrageous conduct element of an intentional infliction emotional distress claim, the claim here does not fall in that category: If the officers used excessive force here, they did so for a sustained period in front of the Plaintiff's husband and mother, and in the vicinity of her minor children.  These facts are sufficient to warrant denial of summary judgment as to the intentional infliction of emotional distress claim.

### Counts 11, 12, and 13: Libel, Defamation and Defamation Per Se

The Plaintiff alleges that Canepari and Harris defamed her.[46]  Specifically, she alleges that Canepari included false statements in the § 17a-503(a) form that she "repeatedly told officer she would 'fucking kill you'," that she pushed officers, and that she had abused alcohol.  ECF No. 199 ¶¶ 224, 229; ECF No. 279-5.  She also alleges that Canepari falsely stated in his case/incident report that she pushed Baker and Harris.  ECF No. 199 ¶¶ 234, 237; ECF No. 277-1.  She alleges that Harris falsely stated in his case/incident report that she "pushed" Baker, and that after he handcuffed her, she pulled away and "shoved her body against [his]." ECF No. 199 ¶¶ 244-245, 247; ECF No. 277-5.[47]

To state a claim for defamation under Connecticut law, a plaintiff must plead facts demonstrating that "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004).  "[O]pinion cannot be the basis for a

---

[46] The Plaintiff makes no factual allegations of defamation as to Baker.  Therefore, Counts 11 - 13 are dismissed as to him.  She does allege that Kennedy, Bryson and Downs included false statements in their various medical reports. ECF No. 199 ¶¶ 118, 119, 177-178, 180-185, 192.  I address these allegations in the separate ruling I issue today with regard to the Ambulance defendants.

[47] To the extent that the Plaintiff premises her defamation claim on her allegations that the Defendants made false reports to DCF, that claim is foreclosed by my earlier ruling.

defamation claim." *Moses v. St. Vincent's Special Needs Ctr., Inc.*, 2021 WL 1123851, at *12 (D. Conn. Mar. 24, 2021).

A claim of defamation *per se* requires a plaintiff to allege a statement whose "defamatory meaning ... is apparent on the face of [it]," and accordingly the statement "is actionable without proof of actual damages." *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 491-92 (1987) (citation omitted). "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation." *Id.* at 492 (citation and internal quotation marks omitted). Whether a statement constitutes defamation *per se* "is a question for the court." *Id.* (citation and internal quotation marks omitted). "Connecticut has generally recognized two categories of statements which are actionable as defamatory *per se*: (1) statements charging a plaintiff of a crime, and (2) statements that injure a plaintiff in [her] profession." *Wynn v. New Haven Bd. of Educ.,* 2022 WL 1063732, at *4 (D. Conn. Apr. 8, 2022) (citations omitted).

"Statements made in connection with police investigations are generally not actionable because they are protected by qualified privilege." *Stonick v. Delvecchio*, 438 F. Supp.3d 154, 171 (D. Conn. 2020). *See Hopkins v. O'Connor*, 282 Conn. 821 (2007). "A qualified privilege protects false statements that are not made maliciously." *Gallo v. Barile*, 284 Conn. 459, 463 n.6 (2007) Where that privilege applies, it can be overcome only by a showing that the privilege holder "acted with malice in publishing the defamatory material." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 630 (2009). To defeat this privilege, a plaintiff must show that the speaker acted with either "actual malice" or "malice in fact." *Id.* at 633-34. "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false.... A negligent misstatement of fact will not suffice; the evidence must demonstrate a

purposeful avoidance of the truth.... Malice in fact is sufficiently shown by proof that the [statement was] made with improper and unjustifiable motives." *Gallo*, 284 Conn. at 463 n.6.

The Defendants argue that the Plaintiff has not presented evidence sufficient to support a reasonable inference of malice. I agree with respect to some of the statements.  Specifically, the statements about the Plaintiff's pushing Baker and Harris were the officers' descriptions of rapidly evolving events occurring in close quarters.  Indeed, they may be accurate descriptions of those events; it is difficult to be certain from the body camera footage or the Plaintiff's security camera footage given the speed of the events, the camera angles, and obstruction of the view at times from body parts.  But even if the statements are inaccurate, there is no evidence that they were made with knowledge that they were false or with improper motive; Plaintiff's condition and behavior did not make handcuffing her or placing her in the cruiser objectively unreasonable.  As a result, these statements included in police documents were not necessary to justify the officers' behavior – leaving no evidence of a motive to fabricate them and no other suggestion that they were made maliciously.

Similarly, although the Plaintiff denies that she was intoxicated, I conclude that she has not raised an inference of malice as to the indication of  "alcohol abuse" that Canepari made on the form.  The record is replete with evidence that she had been drinking, and, as with the statements concerning pushing, there is no evidence that Canepari made this statement knowing it was false or with an improper motive.

I find, however, that Canepari's statement in the § 17a-503(a) form that Plaintiff "repeatedly told officer she would fucking kill you" stands on a different footing.  As noted above, that statement is not supported by the body worn camera footage.  While it is true that Canepari was at times in close proximity to the Plaintiff, such as when he escorted her down the steps of the

deck, the audio on the footage is quite clear and Plaintiff was speaking loudly – when she was not shrieking at the top of her lungs – throughout her entire interaction with Canepari; she did not begin to use a somewhat calmer voice until Officer Tornello arrived in the ambulance, and even then the audio of her statements is clear.  Just as the Plaintiff's allegations about being "dragged" to the police cruiser "do not survive the witness of your eyes," *Brown*, 798 F.3d at 104 (Jacobs, J., dissenting), Canepari's statement in the § 17a-503(a) form that Plaintiff made the death threat– let alone that she made it "repeatedly" – do not survive the witness of your ears.  It is true that Harris's body worn camera shows a discussion between him and Canepari about what information to include in the form, and Harris suggests including the information about the death threat, to which Canepari responds, "she did say it."  Harris BWC 20:50:43-52.  But while this provides some evidence that Pal made the death threat, it is not an audio recording of her doing so and so does not "so utterly discredit[]" Pal's sworn denial of the threat, ECF No. 325-1 at para. 149, that "no reasonable jury could … believe [her]."  *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Further, when the record is construed in the Plaintiff's favor, the fact that Canepari asserted that the death threat – not heard at all on the clear audio from the footage – was made "repeatedly" raises a genuine dispute of material fact about whether he made his assertion with the motive of falsely bolstering the case for having the Plaintiff committed under the statute.  As discussed above, there was at least arguable probable cause to support the commitment without any reliance on the Plaintiff's making a death threat, but the context raises at least an inference, when the record is construed in the light most favorable to the Plaintiff, that Canepari was acting out of malice.

### Count 14: Negligence

The Plaintiff alleges that

The injuries damages, and losses sustained by the Plaintiff were caused by the negligence and carelessness of … all Defendants including TOWN OF WILTON,

NORWALK HOSPITAL, NUVANCE HEALTH Inc., including, but not limited to, one or more of the following ways: in that, it failed to properly train the individual Defendants with regard to the proper litigation and procedures for arrests and investigations; in that, it failed to properly train the individual Defendants with regard to the use of force; in that, it failed to properly train the individual Defendants with regard to the proper use of Tasers[48]; in that, it failed to properly train the individual Defendants in the safe performance of their duties; in that, it failed to properly screen the individual Defendant(s) for behavioral problems prior to hiring them; in that, it failed to properly supervise the individual Defendants with regard to the incident in question; in that, it failed to properly supervise and train the individual Defendants and such failure was a deliberate indifference to the probable consequences or constituted an implicit authorization of such consequences; in that, it participates in customs that lead to violations of individual constitutional rights; in that, it acted with deliberate indifference to the constitutional rights of Plaintiff, and similarly situated persons; in that, it failed to enforce the law as it existed; in that, it failed to prevent its police officers and emergency/ambulance personnel from committing illegal actions when it knew or should have known such actions were taking place; in that, it had notice of but repeatedly failed to make any meaningful investigation into charges that its police officers were repeatedly violating Plaintiff's rights under the Constitution of the United States and the State of Connecticut.

ECF No. 199 ¶ 399. This recitation of the allegations comprising this claim make clear that it is directed against the Town of Wilton. (To the extent it is also directed against Norwalk Hospital and Nuvance Health, I address the claim in the separate ruling issued today with respect to those defendants.) Many of these allegations sound in *Monell* liability, a claim as to which I have already granted summary judgment to the Town. However, when the Plaintiff's *pro se* pleadings are liberally construed and interpreted to "to raise the strongest arguments they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (per curiam) (internal quotation marks and emphasis omitted), Count 14 can be read to assert a claim against the Town under Conn. Gen. Stat. § 52-557n(a),[49] which provides:

(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof

---

[48] There is no allegation that tasers were involved in this incident.
[49] The Defendants appear to have similarly understood the Plaintiff to assert such a claim as they address it in their opposition. ECF No. 276-1 at 38.

> acting within the scope of his employment or official duties . . . . (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

Conn. Gen. Stat. § 52-557n(a).

I address whether, as Defendants assert, the Town is immune based on the discretionary act exception referred to in subsection (2)(B) of the above-quoted statute.  See ECF No. 276-1 at 37-38.  "[M]unicipalities are statutorily immune from negligence liability resulting from the discretionary acts of their employees, officers and agents."  *Doe v. Petersen*, 279 Conn. 607, 609 (2006).  Because "[t]he manner in which a police officer makes an arrest fits within the framework of the day to day discretion exercised by police officers," *Belanger v. City of Hartford*, 578 F. Supp.2d 360, 367 (D. Conn. 2008), the actions of the municipal employees in this case are discretionary.  The Town is thus immune unless  one of the three recognized exceptions to discretionary act immunity is met:

> (1) where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; (2) where a statute specifically provides for a cause of action against a municipality or municipal officer for failure to enforce certain laws; and (3) where the alleged acts involve malice, wantonness or intent to injure, rather than negligence.

*Evon v. Andrews*, 211 Conn. 501, 505 (1989).  Of the three exceptions, only one arguably applies - the identifiable person-imminent harm exception.  That exception provides that "liability may be imposed when 'the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm...." *Doe v. Petersen*, 279 Conn. 607, 616 (2006) (quoting *Evon*, 211 Conn. at 505).  The "identifiable person-imminent harm exception" to governmental immunity "has three requirements: (1) an imminent harm; (2) an

identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Haynes v. City of Middletown*, 314 Conn. 303, 313 (2014). "In addition to these three requirements, courts in this state have also held that the imminent harm complained of must be physical in nature in order for the exception to apply." *Bento v. City of Milford*, 2014 WL 1690390, at *6 (D. Conn. Apr. 29, 2014).

The identifiable person-imminent harm exception has been applied "in the context of excessive force claims based on affirmative acts where the harm to the individual is so foreseeable as to create ... a duty of care." *Marsh v. Town of E. Hartford*, 2017 WL 3038305, at *8 (D. Conn. July 18, 2017)(internal quotation marks omitted); *see Odom v. Matteo*, 772 F. Supp.2d 377, 395 (D. Conn. 2011) ("Connecticut courts have held that where, as here, an officer is alleged to have used excessive force against a person, he may be found to have subjected an identifiable person to imminent harm and therefore is not protected from suit by the doctrine of governmental immunity."). Here, when the facts are viewed in the light most favorable to the Plaintiff, there is sufficient evidence for a jury to conclude that she was an identifiable victim who was subject to the possibility of imminent harm during the Defendants' handcuffing of her. Because the allegations fall within the identifiable person-imminent harm exception, the Town of Wilton is not entitled to summary judgment as to the Plaintiff's claim under § 52-557n(a) and she may proceed against the Town in negligence as to the acts comprising the Defendants' alleged use of excessive force.

But the same is not true as to her defamation and intentional infliction of emotional distress claims. Conn. Gen. Stat. § 52-557n(a)(2)(A) provides that a political subdivision is not liable for damages to a person caused by "acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct." Under Connecticut law,

willful conduct is tantamount to intentional conduct.  *Dubay v. Irish,* 207 Conn. 518, 533 n.8 (1988); *Avoletta v. City of Torrington,* 133 Conn. App. 215, 224 (2012) ("[A] municipality cannot be held liable for the intentional torts of its employees.").  Defamation and intentional infliction of emotional distress are intentional torts.  *See Parks v. Town of Southington*,  2021 WL 779186, at *8 (Conn. Super. Ct. Feb. 3, 2021) (holding that defamation and intentional infliction of emotional distress were intentional torts for which liability against the town was precluded by § 52-557n(a)(2)(A) ); *Lippolis v. Panagoulias*, 2014 WL 7272285, at *5 (Conn. Super. Ct. Nov. 17, 2014) (holding that defamation is an intentional tort for which the Board of Education is not liable under § 52–557n(a)(2)(A)).  As a result, the Town of Wilton is immune from suit as to these claims.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (ECF No. 276) is GRANTED as to counts as to 1, 2, 4-7, 11-13 as to Canepari, Harris and Baker, and the Town, and DENIED as to counts 3 and 8-10 as to Canepari, Harris and Baker, counts 11-13 as to Canepari, and count 14 as to the Town.  All of the Plaintiff's claims against Tornello and Lynch are DISMISSED. The claims remaining for trial are excessive force (count 3), assault and battery (count 8), negligent infliction of emotional distress (count 9) and intentional infliction of emotional distress (count 10) against Canepari, Harris, and Baker; libel (count 11), defamation (count 12), and defamation per se (count 13) against Canepari; and negligence (count 14) against the Town.

IT IS SO ORDERED.

Dated:  March 30, 2023
       Hartford, Connecticut

                                       /s/
                              Michael P. Shea, U.S.D.J.